*Townsend v. Quality Loan Service Corp. et.al. 12-2-10932-5*

# EXHIBIT 5

# PACER/MOTION FOR RELIEF FROM STAY FILED BY FIRST HORIZON HOME LOANS, A DIVISION OF FIRST TENNESSEE BANK, N.A

1    The Honorable Paul B Snyder
     Chapter 7
2    Hearing Date: 12/17/2009
     Hearing Time: 9:00am
3    Location: Union Station, Courtroom H
     1717 Pacific Avenue, Tacoma, WA
4    Response Date: 12/10/2009

5

6

7              UNITED STATES BANKRUPTCY COURT
         FOR THE WESTERN DISTRICT OF WASHINGTON
8                       AT TACOMA

9    In re:                          | Case No.: 09-47534-PBS

10   Scott W Townsend                 | Chapter   7
     Deborah L Townsend
11                                    | MOTION FOR RELIEF FROM STAY and
12       Debtors                      | NOTICE OF HEARING

13                    **NOTICE OF HEARING**

14        PLEASE TAKE NOTICE that the Motion for Relief from the Automatic Stay (the

15   "Motion") filed by First Horizon Home Loans, a division of First Tennessee Bank National

16   Association, is set for hearing as follows:

17
     Judge: Paul B Snyder                    Time: 9:00am
18   Place: Union Station, Courtroom H
     1717 Pacific Avenue, Tacoma, WA         Date: 12/17/2009
19

20        IF YOU OPPOSE the Motion, you must file and serve your response NO LATER THAN

21   THE RESPONSE DATE which is 7 days prior to the hearing.  IF NO RESPONSE IS TIMELY

22   FILED AND SERVED, the Court may, in its discretion, GRANT THE MOTION PRIOR TO

23   THE HEARING WITHOUT FURTHER NOTICE, and strike the hearing.

24

25

Notice of Hearing - 1                        McCarthy & Holthus, LLP
MH# WA09-48261                               19735 10th Ave NE Suite N200
                                             Poulsbo, WA 98370
                                             206.319.9100

00106

## MOTION

Pursuant to 11 USC §362(d)(1) and (2), First Horizon Home Loans, a division of First Tennessee Bank National Association ("Secured Creditor") moves this court for an Order Terminating the Automatic Stay. In support of the Motion, Secured Creditor alleges:

1. This Bankruptcy was filed on 10/08/2009.

2. This Motion affects the real property commonly known as **1221 14th Avenue, Fox Island, WA 98333** (the "Property"). The full legal description of the Property is listed on the Deed of Trust.

3. This Motion seeks relief from the stay only, and does not seek to establish or determine any of Secured Party's legal interests, if any, in the Property

4. Secured Creditor has standing to bring this Motion because it is the owner and Holder of the Original Promissory Note that creates the loan obligation. It is also the beneficiary under the Deed of Trust that encumbers the Property.  Secured Creditor is entitled to receive the payments made by the Debtors under the Note. Secured Creditor is entitled to enforce the terms of the security instruments encumbering the Property.

5. Secured Creditor is entitled to rely on its pleadings to establish standing. "In ruling on a FED. R. CIV. P. 12(b)(6) motion to dismiss for lack of standing, we must construe the complaint in favor of the complaining party." Hong Kong Supermarket v. Kizer, 830 F.2d 1078, 1080-81 (9th Cir. 1987).  Secured Creditor is entitled to rely on its assertion that it has standing unless a party offers evidence otherwise. The burden of proof of disproving standing is on the non-moving party. 11 U.S.C. §362(g)(2).

6. Stay relief may be requested by "*a party in interest.*" 11 U.S.C. §362(d). This term is broader than "*the real party in interest.*" Federal Rule of Procedure 17(a)(1)(f) further

Motion for Relief - 1
MH# WA09-48261

McCarthy & Holthus, LLP
19735 10th Ave NE Suite N200
Poulsbo, WA 98370
206.319.9100

Case 09-47534-PBS   Doc 18   Filed 11/20/09   Ent. 11/20/09 12:35:23   Pg. 2 of 8

00107

provides that "a party with whom or in whose name a contract has been made *for the benefit of another*...may sue in that person's own name without joining the party for whose benefit the action is brought" (emphasis added). This is not limited to a creditor, but can be *any party* with an interest in the matter.

The statutes regarding standing and parties in interest are intended to be read liberally.

> Subsection (d) grants relief from the automatic stay, under certain conditions, to "a party in interest." Had Congress intended the section to apply only to secured creditors, it undoubtedly would have so stated. Further, nothing in the legislative history implies that Congress intended the restrictive application [Debtor] urges. *See* S. Rep. No. 989, 95th Cong., 2d Sess. 52, *reprinted in* [1978] U.S. Code Cong. & Ad. News 5838.
> ***

> While we agree that Congress intended that the automatic stay have broad application, the legislative history to § 362 clearly indicates that Congress recognized that the stay should be lifted in appropriate circumstances. It states:
> It will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from many duties that may be handled elsewhere.

> *In re Honosky,* 6 Bankr. 667, 669 (S.D.W.Va. 1980) *citing* S. Rep. No. 989, 95th Cong., 2d Sess. 50, *reprinted in* [1978] U.S. Code Cong. & Ad. News 5836.

7.  The loan was originally incurred on 08/25/2006. The Deed of Trust was recorded in Pierce County, Washington, and properly encumbers the Property and secures payment of the Promissory Note. The Note was assigned and sold to Secured Creditor. Secured Creditor owns the Note.

8.  Debtors have defaulted in payments under the Note and Deed of Trust as listed below. The default figures stated below should not be relied upon for reinstatement as additional monthly payments, interest and other fees may be accruing or have accrued under the terms of the Deed of Trust. A current reinstatement or payoff statement may be obtained upon request.

Motion for Relief - 2
MH# WA09–48261

McCarthy & Holthus, LLP
19735 10th Ave NE Suite N200
Poulsbo, WA 98370
206.319.9100

00108

| | | | | |
|---|---|---|---|---|
| Payments: 11/1/08 - 11/1/09 | 13 At | $ | 4,807.39 | $ | 62,496.07 |
| Late Charges: | | | | $ | 894.88 |
| Corporate Advances: | | | | $ | 2,555.40 |
| **Total Default:** | | | | $ | 65,946.35 |
| **Total Owed to Secured Creditor:** | | | | $ | 712,303.48 |

9.     The legislative history of the Bankruptcy Code directs that a motion for relief is to be

treated analogous to an injunction, and that the stay should only remain in place if there is

a "reasonable likelihood that the party opposing the relief from stay will prevail at the

final hearing." Thus, the *opposing party* must establish factual grounds that they will win

at the final hearing. Simply objecting to the motion based on complaints of inadequate

proof by the Secured Creditor is inadequate. It is the *opposing party's* burden to prove

that the Stay should remain in effect. 11 U.S.C. §362(g)(2). If the opposing party does not

establish this, then the stay relief should be granted.

> After a preliminary hearing, the court may continue the stay only if there is a
> reasonable likelihood that the party opposing relief from the stay will prevail at
> the final hearing. Because the stay is essentially an injunction, the three stages of
> the stay may be analogized to the three stages of an injunction. The filing of the
> petition which gives rise to the automatic stay is similar to a temporary restraining
> order. The preliminary hearing is similar to the hearing on a preliminary
> injunction, and the final hearing and order are similar to the hearing and issuance
> or denial of a permanent injunction. The main difference lies in which party must
> bring the issue before the court. While in the injunction setting, the party seeking
> the injunction must prosecute the action, in proceedings for relief from the

Motion for Relief - 3
MH# WA09-48261

McCarthy & Holthus, LLP
19735 10th Ave NE Suite N200
Poulsbo, WA 98370
206.319.9100

00109

1   automatic stay, the enjoined party must move. The difference does not, however,
2   shift the burden of proof. Subsection (g) leaves that burden on the party opposing
    relief from the stay (that is, on the party seeking continuance of the injunction) on
3   the issue of adequate protection and existence of an equity.

4   (H. Rept. No. 95-595 to accompany H.R. 8200, 95th Cong., 1st Sess. (1977) pp.
    340-344.)

5

6   10.   The only issues that are to be addressed in the motion for relief are the creditor's

7   adequate protection, the debtor's equity in the property, and the necessity of the property

8   for an effective reorganization.  Other issues, or issues that can be raised in state court or

9   by adversary proceeding, are inappropriate in evaluating the motion for relief.

10  The action commenced by the party seeking relief from the stay is referred to as a
    motion to make it clear that at the expedited hearing under subsection (e), and at
11  hearings on relief from the stay, the only issue will be the lack of adequate
    protection, the debtor's equity in the property, and the necessity of the property to
12  an effective reorganization of the debtor, or the existence of other cause for relief
13  from the stay. This hearing will not be the appropriate time at which to bring in
    other issues, such as counterclaims against the creditor, which, although relevant
14  to the question of the amount of the debt, concern largely collateral or unrelated
    matters.
15

16  (S. Rept. No. 95-989 to accompany S. 2266, 95th Cong., 2d Sess. (1978) pp. 52,
    53, 55.)
17

18  11.   Under 11 U.S.C. 362 (d), any party in interest may move for stay relief.  If a party in

19  interest moves for stay relief, the Court *must* grant relief for cause or if there is a lack of

20  equity in the property and it is not necessary for a reorganization:

21  d) On request of *a party in interest* and after notice and a hearing, the court *shall*
    grant relief from the stay provided under subsection (a) of this section, such as by
22  terminating, annulling, modifying, or conditioning such stay—
23      (1) for cause, including the lack of adequate protection of an interest in
        property *of such party in interest*;
        (2) with respect to a stay of an act against property under subsection (a) of
24      this section, if—
            (A) the debtor does not have an equity in such property; and
25          (B) such property is not necessary to an effective reorganization;

Motion for Relief - 4                                    McCarthy & Holthus, LLP
MH# WA09-48261                                           19735 10th Ave NE Suite N200
                                                         Poulsbo, WA 98370
                                                         206.319.9100

00110

11 U.S.C. §362(d) (emphasis added)

12. The Ninth Circuit Court of Appeals has also squarely addressed this issue. The Bankruptcy Court is not to evaluate the merits of the underlying claim as part of the stay relief motion. The Bankruptcy Court's role is limited to determining whether the creditor is adequately protected. If not, then the court must grant stay relief regardless of whether the court believes that the creditor will ultimately prevail on the merits in state court:

> Stay litigation is limited to issues of the lack of adequate protection, the debtor's equity in the property, and the necessity of the property to an effective reorganization. Hearings on relief from the automatic stay are thus handled in a summary fashion. In re Cedar Bayou, Ltd., 456 F. Supp. 278, 284 (W.D. Pa. 1978). *The validity of the claim or contract underlying the claim is not litigated during the hearing.* The action seeking relief from the stay is not the assertion of a claim which would give rise to the right or obligation to assert a counterclaim. In re Essex Properties, Ltd., 430 F. Supp. 1112 (N.D. Cal. 1977). See S. Rep. No. 989, 95th Cong., 2d Sess. 55, reprinted in 1978 U.S. Code Cong. & Ad. News, 5787, 5841. *Thus, the state law governing contractual relationships is not considered in stay litigation.*
>
> In Re: Johnson, 756 F.2d 738, 740 (9th Cir., 1985).

13. A foreclosure proceeding may have commenced, details of which were not available at the time this Motion was filed.

14. In addition to the delinquencies listed above, the Court should grant the Motion for the following reasons:

    a. Debtors have failed to make post-petition loan payments.

    b. Debtors do not have the ability to continue to make payments during the pendency of the bankruptcy case. Therefore, Secured Creditor is not adequately protected.

Motion for Relief - 5
MH# WA09-48261

McCarthy & Holthus, LLP
19735 10th Ave NE Suite N200
Poulsbo, WA 98370
206.319.9100

Case 09-47534-PBS   Doc 18   Filed 11/20/09   Ent. 11/20/09 12:35:23   Pg. 6 of 8

00111

c.  The continuation of the automatic stay will cause irreparable harm to Secured Creditor and will deprive Secured Creditor of adequate protection to which it is entitled under 11 U.S.C. §362 and §363.

d.  Debtors have insufficient equity to protect Secured Creditor's interest during the bankruptcy proceeding.

e.  The Property is not necessary for an effective reorganization.

f.  Debtors intend to surrender the Property.

15.  The following documents are attached as Exhibits to this Motion:

a.  Exhibit 1 - Secured Creditor's file copy of the Promissory Note.

b.  Exhibit 2 - Copy of Deed of Trust.

c.  Exhibit 3 - Copy of Assignment of the Deed of Trust.

WHEREFORE, Secured Creditor requests:

1.  An Order Terminating the Automatic Stay.

2.  An Order waiving the 10-day stay pursuant to Bankruptcy Rule 4001(a)(3).

3.  Alternatively, for an Order requiring adequate protection of Secured Creditor's interest in the Property.

4.  For attorney fees and costs incurred herein.

5.  For such other relief as the Court deems proper.

Dated: November 20, 2009                    McCarthy & Holthus, LLP

/s/ Angela M. Michael
Matthew R. Cleverley, Esq., WSBA #32055
Angela M. Michael, Esq., WSBA #37727
Joni M. Derifield, Esq., WSBA #34268
Attorneys for Secured Creditor

Motion for Relief - 6
MH# WA09-48261

McCarthy & Holthus, LLP
19735 10th Ave NE Suite N200
Poulsbo, WA 98370
206.319.9100

00112

## CERTIFICATE OF SERVICE

On 11/20/2009, I served the foregoing **MOTION FOR RELIEF FROM STAY and NOTICE OF HEARING** on the following individuals by electronic means through the Court's ECF program:

COUNSEL FOR DEBTORS
Noel P. Shillito
shillito@callatg.com

TRUSTEE
Terrence J. Donahue
bankruptcy@eisenhowerlaw.com

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

/s/ Cretu Andrada
Cretu Andrada

On 11/20/2009, I served the foregoing **MOTION FOR RELIEF FROM STAY and NOTICE OF HEARING** on the following individuals by depositing true copies thereof in the United States mail, enclosed in a sealed envelope, with postage paid, addressed as follows:

DEBTORS
Scott W Townsend
Deborah L Townsend
PO Box 491
Fox Island, WA 98333

SPECIAL NOTICE
ALS - GE Recovery Management Systems Corporation
25 SE 2nd Avenue #1120
Miami, FL 33131-1605

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

/s/ Hue Banh
Hue Banh

Motion for Relief - 7
MH#WA09-48261

McCarthy & Holthus, LLP
19735 10th Ave NE Suite N200
Poulsbo, WA 98370
206.319.9100

00113

# EXHIBIT 1

00114

993

# ADJUSTABLE RATE NOTE

### (LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| August 25th, 2006 | TACOMA | WASHINGTON |
|---|---|---|
| [Date] | [City] | [State] |

1221 14TH AVENUE, FOX ISLAND, Washington 98333
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 650,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. Lender is **FIRST HORIZON HOME LOAN CORPORATION**

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 7.625 %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay Principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on October 1st, 2006 I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on September 1st, 2036, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at PO BOX 809
MEMPHIS, TN 38101
or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ 4,130.21. This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid Principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

---

**MULTISTATE ADJUSTABLE RATE NOTE - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *THE WALL STREET JOURNAL*) - Single Family - Fannie Mae UNIFORM INSTRUMENT**

Wolters Kluwer Financial Services
VMP®-838N (0210).01
Page 1 of 4

Form 3520 1/01
Initials:

00115

993

### 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on the first day of **September, 2011**              , and on that day every **6th** month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **TWO AND ONE-QUARTER**                     percentage points ( **2.250**              %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **13.625**      % or less than **2.250**       %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **TWO & 00/100**                 percentage point(s) ( **2.00**      %) from the rate of interest I have been paying for the preceding **6**     months. My interest rate will never be greater than **13.625**      %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

### 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

### 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

Form 3520 1/01
Initials

00116

 3993

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of   15  calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be          5.00                  % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

00117

993

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Deborah Townsend_ _____ (Seal)
DEBORAH TOWNSEND                -Borrower

_____ (Seal)
SCOTT TOWNSEND              -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

[Sign Original Only]

VMP®-838N (0210).01                    Page 4 of 4                    Form 3520 1/01

00118

*Townsend v. Quality Loan Service Corp. et.al. 12-2-10932-5*

# EXHIBIT 6

# LEGAL DESCRIPTION OF THE PROPERTY OF 1221 14TH AVE, FOX ISLAND, WA

200609060376.016

EXHIBIT "A"

██████3993

## LEGAL DESCRIPTION EXHIBIT

BEGINNING AT THE NORTHWEST CORNER OF LOT 1, PIERCE COUNTY SHORT PLAT
NUMBER 200005195001, ACCORDING TO THE PLAT THEREOF RECORDED MAY 19, 2000,
RECORDS OF PIERCE COUNTY AUDITOR.
THENCE SOUTH 89°32'34" EAST 513.86 FEET;
THENCE SOUTH 00°51'39" WEST 149.23 FEET;
THENCE NORTH 87°47'16" EAST 239.06 FEET;
THENCE SOUTH 80°26'07" EAST 387.61 FEET;
THENCE SOUTH 82°55'58" EAST 201.36 FEET TO THE EAST LINE OF SAID SHORT
PLAT;
THENCE SOUTH ALONG THE EAST LINE OF SAID SHORT PLAT 02°25'22" WEST 107.43
FEET;
THENCE NORTH 89°32'34" WEST 1333.00 FEET TO THE WEST LINE OF SAID SHORT
PLAT;
THENCE NORTH ALONG THE WEST LINE OF SAID SHORT PLAT 00°51'39" EAST 330.00
FEET TO THE POINT OF BEGINNING.

EXCEPT ANY PORTION THEREOF LYING WITHIN 14TH AVENUE.

TOGETHER WITH SECOND CLASS TIDELANDS ABUTTING THEREON.

SITUATE IN THE COUNTY OF PIERCE, STATE OF WASHINGTON.

00120

E-FILED
IN COUNTY CLERK'S OFFICE
PIERCE COUNTY, WASHINGTON

July 18 2012 11:09 AM

KEVIN STOCK
COUNTY CLERK
NO: 12-2-10932-5

1

2

3

4

5

6

7

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF PIERCE

8

9  SCOTT TOWNSEND & DEBORAH
   TOWNSEND, husband and wife,
            Plaintiffs,

10

11        vs.                                    CASE NO: 12-2-10932-5

12  QUALITY LOAN SERVICE CORP. OF
    WASHINGTON; THE ENTITY KNOWN AS

13  "THE BANK OF NEW YORK MELLON,
    F/K/A THE BANK OF NEW YORK, AS
    TRUSTEE FOR THE HOLDERS OF THE

14  CERTIFICATES, FIRST HORIZON
    MORTGAGE PASS-THROUGH                        MOTION TO SHOW CAUSE AS TO

15  CERTIFICATES SERIES FHAMS 2006-AA6,          WHY  TRUSTEE'S SALE SHOULD
    BY FIRST HORIZON HOME LOANS, A               NOT BE RESTRAINED

16  DIVISION OF FIRST TENNESSEE BANK
    NATIONAL ASSOCIATION, MASTER

17  SERVICER, IN ITS CAPACITY AS AGENT
    FOR THE TRUSTEE UNDER THE POOLING

18  AND SERVICING AGREEMENT";  FIRST
    HORIZON HOME LOAN CORPORATION,

19  FIRST HORIZON HOME LOANS, A
    DIVISION OF FIRST TENNESSE BANK,

20  N.A.; MORTGAGE ELECTRONIC
    REGISTRATION SYSTEMS, INC.;

21  NATIONSTAR MORTGAGE LLC.

22            Defendants.

23

24

1

## I. RELIEF REQUESTED

2     Pursuant to RCW 61.24.130(1), Plaintiffs, by and through their counsel, Ha Thu Dao, Esq.,

3   move to restrain the nonjudicial foreclosure of their home as initiated by Defendant QUALITY

4   LOAN SERVICE CORP. OF WASHINGTON, with the involvement, assistance and production

5   of supporting documents from all the named defendants including THE ENTITY KNOWN AS

6   "THE BANK OF NEW YORK MELLON, F/K/A THE BANK OF NEW YORK, AS TRUSTEE

7   FOR THE HOLDERS OF THE CERTIFICATES, FIRST HORIZON MORTGAGE PASS-

8   THROUGH CERTIFICATES SERIES FHAMS 2006-AA6, BY FIRST HORIZON HOME

9   LOANS, A DIVISION OF FIRST TENNESSEE BANK NATIONAL ASSOCIATION,

10   MASTER SERVICER, IN ITS CAPACITY AS AGENT FOR THE TRUSTEE UNDER THE

11   POOLING AND SERVICING AGREEMENT";  FIRST HORIZON HOME LOAN

12   CORPORATION, FIRST HORIZON HOME LOANS, A DIVISION OF FIRST TENNESSE

13   BANK, N.A.; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.;

14   NATIONSTAR MORTGAGE LLC.  The statute allows for a Temporary Restraining Order on

15   "any proper ground" upon five-day notice to the trustee, in this case, is Defendant Quality Loan

16   Service Corp. of Washington ("Quality").  The Plaintiffs request that an Order be issued

17   directing Defendant Trustee to appear and show cause, if any it may have. **This Motion is being**

18   **verified by Plaintiff Deborah Townsend by her Declaration as attached.**

19

## II. STATEMENT OF FACTS AND PROCEDURAL HISTORY

20     1.  Quality Loan Service Corp. of Washington ("Quality") has issued and recorded

21          several notices of Trustee's Sale against the Plaintiffs and their homestead located at

22          1221 14th Avenue, Fox Island, WA.  The most recent Notice of Trustee's Sale

23          recorded on April 23, 2012, states that the sale date is scheduled for July 20, 2012

24

(Exhibit 1, 4/23/12 Notice of Trustee's Sale). However, when Plaintiffs called the dedicated telephone line to determine the status of the foreclosure sale, they learned that the sale date has been postponed to July 27, 2012, "at the Trustee's discretion." (Declaration of Deborah Townsend in support of Motion for TRO).

2.   **The subject Notice of Trustee's Sale refers to the certain Deed of Trust executed by Plaintiffs in 2006. In this DOT, the original lender is First Horizon Home Loan Corp., a Kansas corporation, the nominee is Mortgage Electronic Registration Systems Inc. or MERS, a Delaware corporation, and the Trustee with the power of sale is Chicago Title Insurance Company** (Exhibit 2, DOT).

3.   There is nothing in the public records to indicate that Chicago Title has resigned as trustee under the DOT. Similarly, there is nothing to support Quality's claim to be the trustee under the subject DOT who possesses the power of sale as provided for in RCW 61.24.010 (2).

4.   **Despite the lack of any authority to act as trustee under the DOT, Quality has issued no less than six Notices of Trustee's Sale and recorded the same in the public records.** In addition to the Notice of April 2012, there were Notices of 12/31/2009, Instrument No. 200912310306; 3/17/2010, Instrument No. 201003170204;  4/2/2010, Instrument No. 201004020015; 1/20/2011, Instrument No. 201101200432; 6/2/2011, Instrument No. 201106020039.

5.   As mentioned, **when the DOT was executed in September of 2006, it lists First Horizon Home Loan Corporation as Lender and MERS as nominee and beneficiary. On 3/30/2009, an Assignment of Deed of Trust was recorded in the public records of Pierce County to memorialize how MERS had assigned "all**

1    beneficial interest to First Horizon Home Loans, a division of First Tennessee

2    Bank National Association." (Exhibit 3, Assignment of Deed of Trust).

3    6.    The entity that one of the Notices of Trustee's Sale refers to as the preparer of

4    documents is MetLife Home Loans a division of MetLife Bank, N.A.  On MetLife

5    Home Loans's webpage, the company explains that "**In September 2008, MetLife**

6    **Home Loans officially acquired First Horizon Home Loans, the residential**

7    **origination and servicing division of First Tennessee Bank National Association,**

8    **a subsidiary of First Horizon National Corporation. As a result of this**

9    **acquisition, First Horizon Home Loans is now MetLife Home Loans.**"

10    https://secure.wholesale.metlifehomeloans.com/un_about.htm. Why MERS assigned

11    First Horizon Home Loans, a division of First Tennessee Bank, NA, in 2009 and not

12    MetLife Home Loans who had acquired the entity in 2008 remains unclear.

13    7.    To add on to the mystery, **on March 30, 2012, three years later, another**

14    **Assignment of Deed of Trust was recorded in the public records. This document**

15    **memorializes First Horizon Home Loans, a division of First Tennessee Bank**

16    **National Association's act of assigning to "The Bank of New York Mellon, f/k/a**

17    **The Bank of New York, as Trustee for the holders of the Certificates, First**

18    **Horizon Mortgage Pass-Through Certifies Series FHAMS 2006-AA6, by First**

19    **Horizon Home Loans, a division of First Tennessee Bank National Association,**

20    **Master Servicer, in its capacity as agent for the Trustee under the Pooling and**

21    **Servicing Agreement.**" (Exhibit 4, Assignment of Deed of Trust recorded

22    3/16/2012) .

23    8.    According to this document as recorded in the public records, the mortgage loan,

24

1   including the power of sale, was now transferred to a 2006-securitized trust. **Despite**

2   **the fact that securitized trusts are registered with the SEC and their Pooling and**

3   **Servicing Agreements can be readily located on the SEC's website, this**

4   **particular securitized trust as identified on the Second Assignment of Deed of**

5   **Trust cannot be located**.  The Assignment was executed by yet another entity,

6   Nationstar Mortgage LLC, attorney in fact for First Horizon Home Loans, a division

7   of First Tennessee Bank National Association (<u>Exhibit 4,  Assignment of DOT</u>

8   <u>recorded 3/16/2012</u>). This declaration was made despite the lack of any power of

9   attorney being produced whatsoever.

10   9.   The law firm of McCarthy & Holthus , LLP, had represented to the United States

11   District Court, Western District of Washington Bankruptcy Court in Case No. 09-

12   47534, that First Horizon Home Loans, a division of First Tennessee Bank, N.A. is

13   "Owner and Holder of the Original Promissory Note that creates the loan obligation."

14   The law firm further asserted that First Horizon Home Loans, a division of First

15   Tennessee Bank, N.A., is "also the beneficiary under the Deed of Trust that

16   encumbers the property."  The law firm filed a copy of the Promissory Note in

17   support of this assertion which has no endorsement to First Horizon Home Loans, a

18   division of First Tennessee Bank, N.A., or an allonge to substantiate its claim that the

19   Note was assigned or sold; the Note remains in the original lender's name. (<u>PACER</u>

20   <u>Case 09-47534, Doc. 18, filed 11/20/2009</u>).

21   **V.  LEGAL ARGUMENTS**

22   **There are sufficient grounds upon which the foreclosure should be restrained**

23   <u>**Ground One. Quality does not have authority to act as successor trustee**</u>. It is undisputed

24

1    that the original trustee named in the Deed of Trust is Chicago Title. It is further undisputed that

2    there is no notice of resignation of trustee/appointment of a successor trustee filed in Pierce

3    County where the Plaintiffs' home is located. RCW 61.24.010(2) specifies that "Only upon

4    recording the appointment of a successor trustee in each county in which the deed of trust is

5    recorded, the successor trustee shall be vested with all powers of an original trustee." Failing to

6    strictly adhere to the mandate of the statute means that Quality, whose name is not on the Deed

7    of Trust and who has not been appointed as successor trustee, is without any power to act on

8    behalf of the Beneficiary. *GMAC Mortgage Co. v. Wynkoop*, 2007 Wash. App. LEXIS 2813

9    (Wash. Ct. App., Oct. 8, 2007) .

10    **Ground Two. Pursuant to RCW 61.24.040(1)(a), the Notice of Trustee's Sale must be**

11    **recorded at least 90 days prior to the scheduled foreclosure sale**; however, the Notice of

12    Trustee's Sale in this case was not recorded until April 23, 2012, which is 88 days before the

13    scheduled sale date of July 20, 2012.  Therefore, the Notice of Trustee's sale is invalid.

14    **Ground Three. The identity of the Beneficiary under the Deed of Trust cannot be**

15    **ascertained**. Under the Deed of Trust Act, the trustee must have proof that the beneficiary is the

16    owner of any promissory note or other obligations secured by the deed of trust before issuing a

17    notice of trustee's sale. RCW 61.24, *et. seq.*. Here, Quality's half a dozen notices of trustee's sale

18    as recorded in the public records of Pierce County raise more questions than answers as to the

19    role that Quality actually plays in the foreclosure. The multiple Assignments of Deed of Trust

20    purporting to clarify actually obscures the issue of ownership of the Note and Mortgage.

21        The facts in *Grant v. First Horizon Home Loans*, 2012 Wash.App. LEXIS 1246 (Court of

22    Appeals of Washington, Division One May 29, 2012) are nearly identical to our facts. In *Grant,*

23    the trustee is Quality Loan Service, the original lender is First Horizon Home Loans, MERS as

24

3501 RUCKER AVE, EVERETT WA 98201
727-269-9334/FAX 727-264-2447
*MOTION TO RESTRAIN FORECLOSURE – 6*

1   nominee assigned the interest and rights under the note and mortgage to Bank of New York

2   Mellon trustee of a securitized trust who claims to be the ultimate owner/holder of the mortgage

3   loan.  Under these facts, as to MERS, the *Grant* court stated that while Bank of New York

4   alleged to have acquired whatever interest it has in the note and deed of trust by assignment from

5   MERS, nothing in the record established conclusively that MERS had any interest in the note to

6   convey: "The note makes no mention of MERS. It identifies only 'First Horizon Corporation

7   d/b/a First Horizon Home Loans' as the 'Note Holder'. There is no evidence that First Horizon

8   transferred the note to MERS or to BNYM." *Id.*   In this case, the Note is made payable to First

9   Horizon Home Loan Corporation and has no endorsement to MERS or to BNYM.

10      The *Grant* court emphasized that the "foreclosing entity must hold the mortgage *at the*

11   *time* of the notice and sale in order to accurately identify itself as the present holder in the notice

12   and in order to have authority to foreclose under the power of sale", citing to *U.S. Bank v.*

13   *Ibanez*, 458 Mass. 637, 941 N.E.2d 40 (2011).  Under the facts of this case, foreclosure was

14   commenced in 2009 and BNYM did not come into any ownership interest or right of the loan

15   until the Second Assignment of Deed of Trust was recorded in March of 2012. BNYM is thus

16   not the proper party to conclude the foreclosure by proceeding to trustee's sale.

17      Given the doubtful nature of both Quality's authority to act as Trustee for BNYM , and

18   BNYM's claim of ownership and right under the Deed of Trust, this Court, which has

19   jurisdiction over the Plaintiffs' property, and as a matter of equity can grant the relief that is

20   warranted, must restrain the sale until these two questions are answered satisfactorily by these

21   entities. *Hubbell v. Ward*, 40 Wn.2d 779, 787, 246 P.2d. 468 (1952).

22                                    **CONCLUSION**

23      Based on the foregoing facts and arguments, the Plaintiffs respectfully request the Court

24

1  to grant Temporary Injunction to Stay the Foreclosure Sale, to award attorney's fees and costs

2  and any other relief that the Court may deem just.

3        DATED this 18th day of July, 2012.

4                                   Respectfully Submitted By:

5                                   /s/ Ha Thu Dao

6                                   HA THU DAO, WSBA 21793

7                                   Counsel for the Plaintiffs

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

*Townsend v. Quality Loan Service Corp. et.al. 12-2-10932-5*

# EXHIBIT 1

# NOTICE OF TRUSTEE'S SALE

#16

Unofficial Document — For reference only, not for re-sale.

RECORDING REQUESTED BY
MetLife Home Loans a division of MetLife
Bank N.A.
4000 Horizon Way
Foreclosure Dept. #6205
Irving, TX 75063

AND WHEN RECORDED MAIL TO:
Quality Loan Service Corp. of Washington
2141 5th Avenue
San Diego, CA 92101

```
201004020015
Electronically Recorded
Pierce County, WA
Julie Anderson, Pierce County Auditor
04/02/2010 08:34 AM
Pages: 3    Fee: $ 64.00
```

3133209
APN: 02-20-07-8-025

SPACE ABOVE THIS LINE FOR RECORDER'S USE

TS No: WA-09-248713-SH

## NOTICE OF TRUSTEE'S SALE
### PURSUANT TO THE REVISED CODE OF WASHINGTON
### CHAPTER 61.24 ET. SEQ.

I.      NOTICE IS HEREBY GIVEN that Quality Loan Service Corp. of Washington, the undersigned Trustee, will on 7/2/2010, at 10:00 AM At the main entrance to the Superior Courthouse, 930 Tacoma Avenue, Tacoma, WA sell at public auction to the highest and best bidder, payable, in the form of cash, or cashier's check or certified checks from federally or State chartered banks, at the time of sale the following described real property, situated in the County of PIERCE, State of Washington, to-wit:

A PTN OF LOTS 1 PIERCE COUNTY SHORT PLAT NUMBER 200005195001

Commonly known as:
1221 14TH AVENUE
FOX ISLAND, WA 98333

which is subject to that certain Deed of Trust dated 8/25/2006, recorded 9/5/2006, under Auditor's File No. 200609060376, in Book XXX, Page XXX records of PIERCE County, Washington, from DEBORAH TOWNSEND AND SCOTT TOWNSEND, WIFE AND HUSBAND, as Grantor(s), to CHICAGO TITLE INSURANCE COMPANY, as Trustee, to secure an obligation in favor of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC AS NOMINEE FOR FIRST HORIZON HOME LOAN CORPORATION, as Beneficiary.

II.     No action commenced by the Beneficiary of the Deed of Trust is now pending to seek satisfaction of the obligation in any Court by reason of the Borrower's or Grantor's default on the obligation secured by the Deed of Trust/Mortgage.

III.    The default(s) for which this foreclosure is made is/are as follows:

Failure to pay when due the following amounts which are now in arrears: $92,872.91

IV.     The sum owing on the obligation secured by the Deed of Trust is: The principal sum of $650,000.00 together with interest as provided in the Note from the 11/1/2008, and such other costs and fees as are provided by statute.

Exhibit 1

00130

T.S. No.: WA-09-348713-SH

V.    The above-described real property will be sold to satisfy the expense of sale and the obligation secured by the Deed of Trust as provided by statute. Said sale will be made without warranty, expressed or implied, regarding title, possession or encumbrances on 7/2/2010. The defaults referred to in Paragraph III must be cured by 6/21/2010 (11 days before the sale date) to cause a discontinuance of the sale. The sale will be discontinued and terminated if at any time before 6/21/2010 (11 days before the sale) the default as set forth in Paragraph III is cured and the Trustee's fees and costs are paid. Payment must be in cash or with cashier's or certified checks from a State or federally chartered bank. The sale may be terminated any time after the 6/21/2010 (11 days before the sale date) and before the sale, by the Borrower or Grantor or the holder of any recorded junior lien or encumbrance by paying the principal and interest, plus costs, fees and advances, if any, made pursuant to the terms of the obligation and/or Deed of Trust.

VI.    A written Notice of Default was transmitted by the Beneficiary or Trustee to the Borrower and Grantor at the following address(es):

| NAME | ADDRESS |
| --- | --- |
| DEBORAH TOWNSEND AND SCOTT TOWNSEND, WIFE AND HUSBAND | 1221 14TH AVENUE FOX ISLAND, WA 98333 |

by both first class and certified mail on 2/18/2009, proof of which is in the possession of the Trustee; and the Borrower and Grantor were personally served, if applicable, with said written Notice of Default or the written Notice of Default was posted in a conspicuous place on the real property described in Paragraph I above, and the Trustee has possession of proof of such service or posting.

VII.    The Trustee whose name and address are set forth below will provide in writing to anyone requesting it, a statement of all costs and fees due at any time prior to the sale.

VIII.    The effect of the sale will be to deprive the Grantor and all those who hold by, through or under the Grantor of all their interest in the above-described property.

IX.    Anyone having any objections to this sale on any grounds whatsoever will be afforded an opportunity to be heard as to those objections if they bring a lawsuit to restrain the sale pursuant to RCW 61.24.130. Failure to bring such a lawsuit may result in a waiver of any proper grounds for invalidating the Trustee's sale.

X.    NOTICE TO OCCUPANTS OR TENANTS – The purchaser at the Trustee's Sale is entitled to possession of the property on the 20th day following the sale, as against the Grantor under the deed of trust (the owner) and anyone having an interest junior to the deed of trust, including occupants who are not tenants. After the 20th day following the sale the purchaser has the right to evict occupants who are not tenants by summary proceedings under Chapter 59.12 RCW. For tenant-occupied property, the purchaser shall provide a tenant with written notice in accordance with RCW 61.24.060.

**If the Trustee is unable to convey title for any reason, the successful bidder's sole and exclusive remedy shall be the return of monies paid to the Trustee and the successful bidder shall have no further recourse.**

**If the sale is set aside for any reason, the Purchaser at the sale shall be entitled only to a return of the deposit paid. The Purchaser shall have no further recourse against the Mortgagor, the Mortgagee, or the Mortgagee's Attorney.**

THIS IS AN ATTEMPT TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

For reference only, not for re-sale.

T.S. No.: WA-09-248713-SH

DATED: 3/29/2010

_Tara Donnella_

Quality Loan Service Corp. of Washington, as Trustee
By: Tara Donnella, Assistant Vice President

For Non-Sale, Payoff and Reinstatement info
Quality Loan Service Corp of Washington
2141 Fifth Avenue
San Diego, CA 92101
(866) 645-7711
Sale Line: 714-573-1965 or Login to:
www.priorityposting.com

For Service of Process on Trustee:
Quality Loan Service Corp., of Washington
19735 10th Avenue NE
Suite N-200
Poulsbo, WA 98370
(866) 645-7711

State of California)
County of San Diego)

On 3/29/10 before me, N. Fuentes a notary public, personally appeared Tara Donnella, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____                    (Seal)
N. Fuentes

N. FUENTES
Commission # 1818432
Notary Public - California
San Diego County
My Comm. Expires Oct 15, 2012

For reference only, not for re-sale.

00132

*Townsend v. Quality Loan Service Corp. et.al. 12-2-10932-5*

# EXHIBIT 2

# DEED OF TRUST

200609060376.001

SEP -- 2006
CHICAGO TITLE

200609060376    28    PGS
09/06/2006 1:03pm $52.00
PIERCE COUNTY, WASHINGTON

Return To:
FHHLC - POST CLOSING MAIL ROOM

1555 W WALNUT HILL LN #200 MC 6712
IRVING, TX 75038

Assessor's Parcel or Account Number: County: 02-20-07-8-005 & 02-20-078-006 AOP City:
Abbreviated Legal Description: A PTN OF LOTS 1 AND 2,
PIERCE COUNTY SHORT PLAT NUMBER 200005195001
[Include lot, block and plat or section, township and range]          Full legal description located on page    3
Trustee: CHICAGO TITLE INSURANCE COMPANY
        4717 SOUTH 19TH                             Additional Grantees located on page  N/A
        TACOMA, WA 98405        [Space Above This Line For Recording Data] ————————
                                                                            3993

# DEED OF TRUST

MIN    100085200584639936

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections
3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided
in Section 16.
(A) "Security Instrument" means this document, which is dated   August 25th, 2006
together with all Riders to this document.
(B) "Borrower" is
DEBORAH TOWNSEND &
SCOTT TOWNSEND, Wife & Husband

Borrower is the trustor under this Security Instrument.
(C) "Lender" is
FIRST HORIZON HOME LOAN CORPORATION

WASHINGTON-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

-6A(WA) (0012)          Form 3048 1/01
Page 1 of 15          Initials:
VMP MORTGAGE FORMS - (800)521-7291

Exhibit 2

00134

200609060376.002

Lender is a CORPORATION
organized and existing under the laws of THE STATE OF KANSAS
Lender's address is 4000 Horizon Way, Irving, Texas 75063

(D) "Trustee" is CHICAGO TITLE INSURANCE COMPANY
      4717 SOUTH 19TH, TACOMA, WA 98405

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated August 25th, 2006
The Note states that Borrower owes Lender

  SIX HUNDRED FIFTY THOUSAND & 00/100                                      Dollars
(U.S. $      650,000.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than SEPTEMBER 1, 2036

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

53993

Initials: ___

-6A(WA) (0012)                     Page 2 of 15                          Form 3048 1/01

00135

200609060376.003

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the        County        of        Pierce                :

[Type of Recording Jurisdiction]        [Name of Recording Jurisdiction]

All that tract or parcel of land as shown on Schedule "A" attached hereto which is incorporated herein and made a part hereof.

Parcel ID Number:  County: 02-20-07-8-005 ~~& 02-20-078-006~~ ~~which~~currently has the address of
1221 14TH AVENUE                                    [Street]
FOX ISLAND                        [City] , Washington    98333    [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

███ 3993
-6A(WA) (0012)                Page 3 of 15            Initials:            Form 3048  1/01

00136

200609060376.004

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any

Initials: _DT AN_

00137

200609060376.005

time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees, and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Initials: _DTc_ _Jvl_

00138

200609060376.006

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to

Initials: 

-6A(WA) (0012)                    Page 6 of 15                    Form 3048  1/01

00139

200609060376.007

hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

Initials ___

-6A(WA) (0012)          Page 7 of 15          Form 3048   1/01

00140

200609060376.008

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

-6A(WA) (0012)                    Page 8 of 15                    Form 3048   1/01

Initials _____

00141

200609060376.009

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Initials:

00142

200609060376.010

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless

-6A(WA) (0012)                    Page 10 of 15                    Initials: [signature]                    Form 3048 1/01

00143

200609060376.011

Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure.

There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check

Initials: 

-6A(WA) (0012)                   Page 11 of 15                   Form 3048   1/01

00144

200609060376.012

or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of

Initials: _____

-6A(WA) (0012)                          Page 12 of 15                          Form 3048  1/01

00145

200609060376.013

release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property at public auction at a date not less than 120 days in the future. The notice shall further inform Borrower of the right to reinstate after acceleration, the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale, and any other matters required to be included in the notice by Applicable Law. If the default is not cured on or before the date specified in the notice, Lender at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee and Lender shall take such action regarding notice of sale and shall give such notices to Borrower and to other persons as Applicable Law may require. After the time required by Applicable Law and after publication of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of the Property for a period or periods permitted by Applicable Law by public announcement at the time and place fixed in the notice of sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the clerk of the superior court of the county in which the sale took place.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs and the Trustee's fee for preparing the reconveyance.

24. Substitute Trustee. In accordance with Applicable Law, Lender may from time to time appoint a successor trustee to any Trustee appointed hereunder who has ceased to act. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

-6A(WA) (0012)                    Page 13 of 15                    Initials: [signature]          Form 3048  1/01

00146

200609060376.014

**25. Use of Property.** The Property is not used principally for agricultural purposes.

**26. Attorneys' Fees.** Lender shall be entitled to recover its reasonable attorneys' fees and costs in any action or proceeding to construe or enforce any term of this Security Instrument. The term "attorneys' fees," whenever used in this Security Instrument, shall include without limitation attorneys' fees incurred by Lender in any bankruptcy proceeding or on appeal.

**ORAL AGREEMENTS OR ORAL COMMITMENTS TO LOAN MONEY, EXTEND CREDIT, OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT ARE NOT ENFORCEABLE UNDER WASHINGTON LAW.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____        _Deborah Townsend_____ (Seal)
                                         DEBORAH TOWNSEND              -Borrower

_____        _____ (Seal)
                                         SCOTT TOWNSEND               -Borrower

_____ (Seal)   _____ (Seal)
                           -Borrower                                 -Borrower

_____ (Seal)   _____ (Seal)
                           -Borrower                                 -Borrower

_____ (Seal)   _____ (Seal)
                           -Borrower                                 -Borrower

████3993

████-6A(WA) (0012)            Page 14 of 15                 Form 3048  1/01

00147

200609060376.015

**STATE OF WASHINGTON**
County of    **PIERCE**                      } ss:

      On this day personally appeared before me
   **DEBORAH TOWNSEND & SCOTT TOWNSEND**

to me known to be the individual(s) described in and who executed the within and foregoing instrument, and
acknowledged that he/she/they signed the same as his/her/their free and voluntary act and deed, for the uses
and purposes therein mentioned.

      GIVEN under my hand and official seal this    1st   day of Sept . 2006

Notary Public in and for the State of Washington, residing at
Olympia

My Appointment Expires on   1-5-08

_____

3993

-6A(WA) (0012)             Page 15 of 15          Initials          Form 3048 1/01

*Townsend v. Quality Loan Service Corp. et.al. 12-2-10932-5*

# EXHIBIT 3

# ASSIGNMENT OF DEED OF TRUST

# RECORDED 03/30/2009



For reference only, not for re-sale.

2006093300543   1   PG
03/30/2006 2:00pm $14.00
PIERCE COUNTY, WASHINGTON

Recording requested by:

America Default Services Company

When recorded mail to:

MetLife Home Loans a division of MetLife Bank NA
4000 Horizon Way
Foreclosure Dept. #6205
Irving, TX 75063

APN : 02-20-07-8-005
Order No.: 3133209

Ln No.: 0058463993

SPACE ABOVE THIS LINE FOR RECORDER'S USE
TS No.: WA-09-248713-SH

## Assignment of Deed of Trust

For value received, the undersigned corporation hereby grants, assigns, and transfers to

**FIRST HORIZON HOME LOANS, a division of FIRST TENNESSEE BANK NATIONAL ASSOCIATION.**

all beneficial interest under that certain Deed of Trust dated 8/25/2006 executed by **DEBORAH TOWNSEND AND SCOTT TOWNSEND, WIFE AND HUSBAND**, as Trustor(s) to **CHICAGO TITLE INSURANCE COMPANY**, as Trustee and recorded as Instrument No. 200609060376, on 9/6/2006, in Book XXX, Page XXX of Official Records, in the office of the County Recorder of PIERCE County, WA together with the Promissory Note secured by said Deed of Trust and also all rights accrued or to accrue under said Deed of Trust.

Dated: 2/13/2009 8:13 AM

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS, INC AS NOMINEE FOR FIRST HORIZON
HOME LOAN CORPORATION

By:

Wanda Collier
Assistant Secretary

State of _____ Texas _____  )
                              ) ss
County of _____ Dallas _____ )

On _3-19-09_ before me, _Penny Lawson_ _____ the
undersigned Notary Public, personally appeared _Wanda Collier_ _____ personally known to me (or
proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

WITNESS my hand and official seal

Signature _Penny Law_

PENNY LAWSON
NOTARY PUBLIC
STATE OF TEXAS
08-27-2011

(Seal)

Exhibit 3

14

00150

*Townsend v. Quality Loan Service Corp. et.al. 12-2-10932-5*

# EXHIBIT 4

# ASSIGNMENT OF DEED OF TRUST

# RECORDED 03/16/2012

00151

201203160478  Page 1 of 2

201203160478 CCONITA          2 PGS
03/16/2012 02:12:29 PM      $15.00
AUDITOR, Pierce County, WASHINGTON

When recorded mail to:

Nationstar Mortgage LLC
350 Highland Drive
Lewisville, TX 75067

TS No.: WA-09-248713-SH
Order No.: 30020519
APN No.: 02-20-07-8-005
MERS MIN No.: 100085200584639936

MERS Telephone No. 1-888-679-6377

Space above this line for recorders use

## Assignment of Deed of Trust

For value received, **FIRST HORIZON HOME LOANS, a division of FIRST TENNESSEE BANK NATIONAL ASSOCIATION**, hereby grants, assigns, and transfers to

**The Bank of New York Mellon f/k/a The Bank of New York, as Trustee for the holders of the Certificates, First Horizon Mortgage Pass-Through Certificates Series FHAMS 2006-AA6, by First Horizon Home Loans, a division of First Tennessee Bank National Association, Master Servicer, in its capacity as agent for the Trustee under the Pooling and Servicing Agreement**

All beneficial interest and all rights accrued or to accrue under that certain Deed of Trust dated 8/25/2006 executed by **DEBORAH TOWNSEND AND SCOTT TOWNSEND, WIFE AND HUSBAND**, as Trustor(s) to **CHICAGO TITLE INSURANCE COMPANY**, as Trustee and recorded as Instrument No. 200609060376, on 9/6/2006, of Official Records, , in the office of the County Recorder of PIERCE County, WA, that secures the underlying promissory note.

**Said Deed of Trust encumbers the real property fully described as:**

A PTN OF LOTS 1 PIERCE COUNTY SHORT PLAT NUMBER 200005195001

And more commonly known as: **1221 14TH AVENUE, FOX ISLAND, WA 98333**

For reference only, not for re-sale.

Exhibit 4

15

00152

TS No.: WA-09-248713-SH

Dated: 3.8.12

Nationstar Mortgage LLC attorney in fact for
FIRST HORIZON HOME LOANS, a division of
FIRST TENNESSEE BANK NATIONAL
ASSOCIATION

By: _____  3.8.12
Allison J Fries
Limited VP, for Nationstar
Mortgage LLC

State of: Texas

County of: Denton                    ) ss

On March 8, 2012 before me, Brandon Jones the
undersigned Notary Public, personally appeared _____
Allison J Fries
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____  (Seal)

BRANDON DAVID JONES
Notary Public, State of Texas
My Commission Expires
September 01, 2015

For reference only, not for re-sale.

Unofficial Document

00153

*Townsend v. Quality Loan Service Corp. et.al. 12-2-10932-5*

# EXHIBIT 5

# PACER/MOTION FOR RELIEF FROM STAY FILED BY FIRST HORIZON HOME LOANS, A DIVISION OF FIRST TENNESSEE BANK, N.A

The Honorable Paul B Snyder
Chapter 7
Hearing Date: 12/17/2009
Hearing Time: 9:00am
Location: Union Station, Courtroom H
1717 Pacific Avenue, Tacoma, WA
Response Date: 12/10/2009

UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| In re: | Case No.: 09-47534-PBS |
| Scott W Townsend<br>Deborah L Townsend | Chapter   7 |
| Debtors | MOTION FOR RELIEF FROM STAY and<br>NOTICE OF HEARING |

## NOTICE OF HEARING

PLEASE TAKE NOTICE that the Motion for Relief from the Automatic Stay (the

"Motion") filed by First Horizon Home Loans, a division of First Tennessee Bank National

Association, is set for hearing as follows:

Judge: Paul B Snyder                    Time: 9:00am
Place: Union Station, Courtroom H
1717 Pacific Avenue, Tacoma, WA        Date: 12/17/2009

IF YOU OPPOSE the Motion, you must file and serve your response NO LATER THAN

THE RESPONSE DATE which is 7 days prior to the hearing.  IF NO RESPONSE IS TIMELY

FILED AND SERVED, the Court may, in its discretion, GRANT THE MOTION PRIOR TO

THE HEARING WITHOUT FURTHER NOTICE, and strike the hearing.

Notice of Hearing - 1
MH# WA09-48261

McCarthy & Holthus, LLP
19735 10th Ave NE Suite N200
Poulsbo, WA 98370
206.319.9100

Case 09-47534-PBS    Doc 18    Filed 11/20/09    Ent. 11/20/09 12:35:23    Pg. 1 of 8

00155

## MOTION

Pursuant to 11 USC §362(d)(1) and (2), First Horizon Home Loans, a division of First Tennessee Bank National Association ("Secured Creditor") moves this court for an Order Terminating the Automatic Stay. In support of the Motion, Secured Creditor alleges:

1.  This Bankruptcy was filed on 10/08/2009.

2.  This Motion affects the real property commonly known as **1221 14th Avenue, Fox Island, WA 98333** (the "Property"). The full legal description of the Property is listed on the Deed of Trust.

3.  This Motion seeks relief from the stay only, and does not seek to establish or determine any of Secured Party's legal interests, if any, in the Property

4.  Secured Creditor has standing to bring this Motion because it is the owner and Holder of the Original Promissory Note that creates the loan obligation. It is also the beneficiary under the Deed of Trust that encumbers the Property. Secured Creditor is entitled to receive the payments made by the Debtors under the Note. Secured Creditor is entitled to enforce the terms of the security instruments encumbering the Property.

5.  Secured Creditor is entitled to rely on its pleadings to establish standing. "In ruling on a FED. R. CIV. P. 12(b)(6) motion to dismiss for lack of standing, we must construe the complaint in favor of the complaining party." <u>Hong Kong Supermarket v. Kizer</u>, 830 F.2d 1078, 1080-81 (9th Cir. 1987). Secured Creditor is entitled to rely on its assertion that it has standing unless a party offers evidence otherwise. The burden of proof of disproving standing is on the non-moving party. 11 U.S.C. §362(g)(2).

6.  Stay relief may be requested by *"a party in interest."* 11 U.S.C. §362(d). This term is broader than *"the real party in interest."* Federal Rule of Procedure 17(a)(1)(f) further

Motion for Relief - 1
MH# WA09-48261

McCarthy & Holthus, LLP
19735 10ᵗʰ Ave NE Suite N200
Poulsbo, WA 98370
206.319.9100

Case 09-47534-PBS   Doc 18   Filed 11/20/09   Ent. 11/20/09 12:35:23   Pg. 2 of 8

00156

1  provides that "a party with whom or in whose name a contract has been made *for the*

2  *benefit of another…*may sue in that person's own name without joining the party for

3  whose benefit the action is brought" (emphasis added). This is not limited to a creditor,

4  but can be *any party* with an interest in the matter.

5  The statutes regarding standing and parties in interest are intended to be read liberally.

6
7  Subsection (d) grants relief from the automatic stay, under certain conditions, to
   "a party in interest." Had Congress intended the section to apply only to secured
   creditors, it undoubtedly would have so stated. Further, nothing in the legislative
8  history implies that Congress intended the restrictive application [Debtor] urges.
   *See* S. Rep. No. 989, 95th Cong., 2d Sess. 52, *reprinted in* [1978] U.S. Code
9  Cong. & Ad. News 5838.
   ***
10
11 While we agree that Congress intended that the automatic stay have broad
   application, the legislative history to § 362 clearly indicates that Congress
12 recognized that the stay should be lifted in appropriate circumstances. It states:
   It will often be more appropriate to permit proceedings to continue in their place
13 of origin, when no great prejudice to the bankruptcy estate would result, in order
   to leave the parties to their chosen forum and to relieve the bankruptcy court from
14 many duties that may be handled elsewhere.

15 *In re Honosky*, 6 Bankr. 667, 669 (S.D.W.Va. 1980) *citing* S. Rep. No. 989, 95th
   Cong., 2d Sess. 50, *reprinted in* [1978] U.S. Code Cong. & Ad. News 5836.
16

17 7.  The loan was originally incurred on 08/25/2006. The Deed of Trust was recorded in

18 Pierce County, Washington, and properly encumbers the Property and secures payment

19 of the Promissory Note. The Note was assigned and sold to Secured Creditor. Secured

20 Creditor owns the Note.

21 8.  Debtors have defaulted in payments under the Note and Deed of Trust as listed below.

22 The default figures stated below should not be relied upon for reinstatement as additional

23 monthly payments, interest and other fees may be accruing or have accrued under the

24 terms of the Deed of Trust. A current reinstatement or payoff statement may be obtained

25 upon request.

Motion for Relief - 2
MH# WA09-48261

McCarthy & Holthus, LLP
19735 10th Ave NE Suite N200
Poulsbo, WA 98370
206.319.9100

00157

| | | | | | | |
|---|---|---|---|---|---|---|
| Payments: 11/1/08 - 11/1/09 | 13 | At | $ | 4,807.39 | $ | 62,496.07 |
| Late Charges: | | | | | $ | 894.88 |
| Corporate Advances: | | | | | $ | 2,555.40 |
| **Total Default:** | | | | | $ | 65,946.35 |
| **Total Owed to Secured Creditor:** | | | | | $ | 712,303.48 |

9.  The legislative history of the Bankruptcy Code directs that a motion for relief is to be

treated analogous to an injunction, and that the stay should only remain in place if there is

a "reasonable likelihood that the party opposing the relief from stay will prevail at the

final hearing." Thus, the *opposing party* must establish factual grounds that they will win

at the final hearing. Simply objecting to the motion based on complaints of inadequate

proof by the Secured Creditor is inadequate. It is the *opposing party's* burden to prove

that the Stay should remain in effect. 11 U.S.C. §362(g)(2). If the opposing party does not

establish this, then the stay relief should be granted.

> After a preliminary hearing, the court may continue the stay only if there is a
> reasonable likelihood that the party opposing relief from the stay will prevail at
> the final hearing. Because the stay is essentially an injunction, the three stages of
> the stay may be analogized to the three stages of an injunction. The filing of the
> petition which gives rise to the automatic stay is similar to a temporary restraining
> order. The preliminary hearing is similar to the hearing on a preliminary
> injunction, and the final hearing and order are similar to the hearing and issuance
> or denial of a permanent injunction. The main difference lies in which party must
> bring the issue before the court. While in the injunction setting, the party seeking
> the injunction must prosecute the action, in proceedings for relief from the

Motion for Relief - 3
MH# WA09-48261

McCarthy & Holthus, LLP
19735 10th Ave NE Suite N200
Poulsbo, WA 98370
206.319.9100

Case 09-47534-PBS   Doc 18   Filed 11/20/09   Ent. 11/20/09 12:35:23   Pg. 4 of 8

00158

automatic stay, the enjoined party must move. The difference does not, however, shift the burden of proof. Subsection (g) leaves that burden on the party opposing relief from the stay (that is, on the party seeking continuance of the injunction) on the issue of adequate protection and existence of an equity.

(H. Rept. No. 95-595 to accompany H.R. 8200, 95th Cong., 1st Sess. (1977) pp. 340-344.)

10.   The only issues that are to be addressed in the motion for relief are the creditor's adequate protection, the debtor's equity in the property, and the necessity of the property for an effective reorganization. Other issues, or issues that can be raised in state court or by adversary proceeding, are inappropriate in evaluating the motion for relief.

> The action commenced by the party seeking relief from the stay is referred to as a motion to make it clear that at the expedited hearing under subsection (e), and at hearings on relief from the stay, the only issue will be the lack of adequate protection, the debtor's equity in the property, and the necessity of the property to an effective reorganization of the debtor, or the existence of other cause for relief from the stay. This hearing will not be the appropriate time at which to bring in other issues, such as counterclaims against the creditor, which, although relevant to the question of the amount of the debt, concern largely collateral or unrelated matters.

(S. Rept. No. 95-989 to accompany S. 2266, 95th Cong., 2d Sess. (1978) pp. 52, 53, 55.)

11.   Under 11 U.S.C. 362 (d), any party in interest may move for stay relief. If a party in interest moves for stay relief, the Court *must* grant relief for cause or if there is a lack of equity in the property and it is not necessary for a reorganization:

> d) On request of *a party in interest* and after notice and a hearing, the court *shall* grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
> (1) for cause, including the lack of adequate protection of an interest in property *of such party in interest*;
> (2) with respect to a stay of an act against property under subsection (a) of this section, if—
> (A) the debtor does not have an equity in such property; and
> (B) such property is not necessary to an effective reorganization;

Motion for Relief - 4
MH# WA09-48261

McCarthy & Holthus, LLP
19735 10th Ave NE Suite N200
Poulsbo, WA 98370
206.319.9100

00159

11 U.S.C. §362(d) (emphasis added)

12.  The Ninth Circuit Court of Appeals has also squarely addressed this issue. The Bankruptcy Court is not to evaluate the merits of the underlying claim as part of the stay relief motion. The Bankruptcy Court's role is limited to determining whether the creditor is adequately protected. If not, then the court must grant stay relief regardless of whether the court believes that the creditor will ultimately prevail on the merits in state court:

> Stay litigation is limited to issues of the lack of adequate protection, the debtor's equity in the property, and the necessity of the property to an effective reorganization. Hearings on relief from the automatic stay are thus handled in a summary fashion. In re Cedar Bayou, Ltd., 456 F. Supp. 278, 284 (W.D. Pa. 1978). *The validity of the claim or contract underlying the claim is not litigated during the hearing.* The action seeking relief from the stay is not the assertion of a claim which would give rise to the right or obligation to assert a counterclaim. In re Essex Properties, Ltd., 430 F. Supp. 1112 (N.D. Cal. 1977). See S. Rep. No. 989, 95th Cong., 2d Sess. 55, reprinted in 1978 U.S. Code Cong. & Ad. News, 5787, 5841. *Thus, the state law governing contractual relationships is not considered in stay litigation.*
>
> In Re: Johnson, 756 F.2d 738, 740 (9th Cir., 1985).

13.  A foreclosure proceeding may have commenced, details of which were not available at the time this Motion was filed.

14.  In addition to the delinquencies listed above, the Court should grant the Motion for the following reasons:

   a.  Debtors have failed to make post-petition loan payments.

   b.  Debtors do not have the ability to continue to make payments during the pendency of the bankruptcy case. Therefore, Secured Creditor is not adequately protected.

Motion for Relief - 5
MH# WA09-48261

McCarthy & Holthus, LLP
19735 10th Ave NE Suite N200
Poulsbo, WA 98370
206.319.9100

Case 09-47534-PBS   Doc 18   Filed 11/20/09   Ent. 11/20/09 12:35:23   Pg. 6 of 8

00160

c. The continuation of the automatic stay will cause irreparable harm to Secured Creditor and will deprive Secured Creditor of adequate protection to which it is entitled under 11 U.S.C. §362 and §363.

d. Debtors have insufficient equity to protect Secured Creditor's interest during the bankruptcy proceeding.

e. The Property is not necessary for an effective reorganization.

f. Debtors intend to surrender the Property.

15. The following documents are attached as Exhibits to this Motion:

a. Exhibit 1 - Secured Creditor's file copy of the Promissory Note.

b. Exhibit 2 - Copy of Deed of Trust.

c. Exhibit 3 - Copy of Assignment of the Deed of Trust.

WHEREFORE, Secured Creditor requests:

1. An Order Terminating the Automatic Stay.

2. An Order waiving the 10-day stay pursuant to Bankruptcy Rule 4001(a)(3).

3. Alternatively, for an Order requiring adequate protection of Secured Creditor's interest in the Property.

4. For attorney fees and costs incurred herein.

5. For such other relief as the Court deems proper.

Dated: November 20, 2009                    McCarthy & Holthus, LLP

/s/ Angela M. Michael
Matthew R. Cleverley, Esq., WSBA #32055
Angela M. Michael, Esq., WSBA #37727
Joni M. Derifield, Esq., WSBA #34268
Attorneys for Secured Creditor

Motion for Relief - 6
MH# WA09-48261

McCarthy & Holthus, LLP
19735 10th Ave NE Suite N200
Poulsbo, WA 98370
206.319.9100

00161

**CERTIFICATE OF SERVICE**

On 11/20/2009, I served the foregoing **MOTION FOR RELIEF FROM STAY and NOTICE OF HEARING** on the following individuals by electronic means through the Court's ECF program:

COUNSEL FOR DEBTORS
Noel P. Shillito
shillito@callatg.com

TRUSTEE
Terrence J. Donahue
bankruptcy@eisenhowerlaw.com

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

/s/ Cretu Andrada
Cretu Andrada

On 11/20/2009, I served the foregoing **MOTION FOR RELIEF FROM STAY and NOTICE OF HEARING** on the following individuals by depositing true copies thereof in the United States mail, enclosed in a sealed envelope, with postage paid, addressed as follows:

DEBTORS
Scott W Townsend
Deborah L Townsend
PO Box 491
Fox Island, WA 98333

SPECIAL NOTICE
ALS - GE Recovery Management Systems Corporation
25 SE 2nd Avenue #1120
Miami, FL 33131-1605

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

/s/ Hue Banh
Hue Banh

Motion for Relief - 7
MH#WA09-48261

McCarthy & Holthus, LLP
19735 10th Ave NE Suite N200
Poulsbo, WA 98370
206.319.9100

00162

# EXHIBIT 1

00163

993

# ADJUSTABLE RATE NOTE

### (LIBOR Six-Month Index (As Published In *The Wall Street Journal*) - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| **August 25th, 2006** | **TACOMA** | **WASHINGTON** |
|---|---|---|
| [Date] | [City] | [State] |

**1221 14TH AVENUE, FOX ISLAND, Washington 98333**
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $     650,000.00          (this amount is called "Principal"), plus interest, to the order of Lender. Lender is
**FIRST HORIZON HOME LOAN CORPORATION**

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      7.625       %. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay Principal and interest by making a payment every month.

I will make my monthly payments on the first day of each month beginning on   **October 1st , 2006**
I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on  **September 1st, 2036**                  , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at     **PO BOX 809**
                                        **MEMPHIS, TN 38101**
or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $      4,130.21       . This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid Principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

**MULTISTATE ADJUSTABLE RATE NOTE - LIBOR SIX-MONTH INDEX (AS PUBLISHED IN *THE WALL STREET JOURNAL*) -**
**Single Family - Fannie Mae UNIFORM INSTRUMENT**

Wolters Kluwer Financial Services
VMP®-838N (0210).01
Page 1 of 4

Form 3520 1/01
Initials: _____

00164

993

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on the first day of **September, 2011**, and on that day every **6th** month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **TWO AND ONE-QUARTER** percentage points ( **2.250** %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than **13.625** % or less than **2.250** %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than **TWO & 00/100** percentage point(s) ( **2.00** %) from the rate of interest I have been paying for the preceding **6** months. My interest rate will never be greater than **13.625** %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

00165

3993

### 7.  BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of  15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        5.00                 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

### 8.  GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

### 9.  OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

### 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

### 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

00166

████████993

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Deborah Townsend_ _____ (Seal)
DEBORAH TOWNSEND                    -Borrower

_____ (Seal)
SCOTT TOWNSEND                      -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

_____ (Seal)
                                    -Borrower

*[Sign Original Only]*

*Townsend v. Quality Loan Service Corp. et.al. 12-2-10932-5*

# EXHIBIT 6

# LEGAL DESCRIPTION OF THE PROPERTY OF 1221 14TH AVE, FOX ISLAND, WA

00168

200609060376.016

3993

## EXHIBIT "A"

### LEGAL DESCRIPTION EXHIBIT

BEGINNING AT THE NORTHWEST CORNER OF LOT 1, PIERCE COUNTY SHORT PLAT
NUMBER 200005195001, ACCORDING TO THE PLAT THEREOF RECORDED MAY 19, 2000,
RECORDS OF PIERCE COUNTY AUDITOR.
THENCE SOUTH 89°32'34" EAST 513.86 FEET;
THENCE SOUTH 00°51'39" WEST 149.23 FEET;
THENCE NORTH 87°47'16" EAST 239.06 FEET;
THENCE SOUTH 80°26'07" EAST 387.61 FEET;
THENCE SOUTH 82°55'58" EAST 201.36 FEET TO THE EAST LINE OF SAID SHORT
PLAT;
THENCE SOUTH ALONG THE EAST LINE OF SAID SHORT PLAT 02°25'22" WEST 107.43
FEET;
THENCE NORTH 89°32'34" WEST 1333.00 FEET TO THE WEST LINE OF SAID SHORT
PLAT;
THENCE NORTH ALONG THE WEST LINE OF SAID SHORT PLAT 00°51'39" EAST 330.00
FEET TO THE POINT OF BEGINNING.

EXCEPT ANY PORTION THEREOF LYING WITHIN 14TH AVENUE.

TOGETHER WITH SECOND CLASS TIDELANDS ABUTTING THEREON.

SITUATE IN THE COUNTY OF PIERCE, STATE OF WASHINGTON.

00169

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF PIERCE

SCOTT TOWNSEND & DEBORAH
TOWNSEND, husband and wife,
                    Plaintiffs,

        vs.

QUALITY LOAN SERVICE CORP. OF
WASHINGTON, et. al.,

                    Defendants.

CASE NO: 12-2-10932-5

DECLARATION OF HA THU DAO
CERTIFYING EFFORTS TO GIVE
NOTICE TO TRUSTEE & IN
SUPPORT OF MOTION FOR ORDER
TO SHOW CAUSE

        I, HA THU DAO, declare under penalty of perjury under the laws of the State of

Washington that the following is true and correct based on my knowledge and belief:

I am over the age of 18, and I am counsel for the Plaintiffs Scott Townsend and Deborah

Townsend.

    1.  I was officially retained by the Plaintiffs on Monday, July 16, 2012. Plaintiffs did not

        obtain legal representation because they have been involved in short sale and loan

        modification processes with the loan servicer and as a result, genuinely believed that

        the sale would not take place while these discussions are still ongoing.

3501 RUCKER AVE, EVERETT WA 98201
727-269-9334/FAX 727-264-2447
COUNSEL'S DECLARATION– 1

00170

2.  Although the Trustee's Sale date has been scheduled by Defendant Quality Loan Service Corp. of Washington ("Quality") for July 27, 2012, at 10 a.m., Quality has *unilaterally* re-scheduled the Trustee's Sale five separate times prior. This fact lends credence to the Plaintiffs' claim that because they were actively involved in short sale negotiation or loan modification that the Defendants would suspend foreclosure efforts.

3.  Upon being retained, I immediately contacted Defendant Quality Loan Service Corp. of Washington, via telephone and fax, in order to inform the company of my involvement and to explore possible resolution of the matter.  It was difficult to get anyone one to speak with me about the matter as I was either transferred to the "wrong department", or to someone who was out of the office. On July 16, 2012, I sent a letter via fax and email to Angela Michael, Esq., of McCarthy & Holthus, LLP, who appeared previously in the bankruptcy court's case involving the Plaintiffs as debtors, but did not have the benefit of a response.

4.  When I was finally able to speak to an individual by the name of Teri Camacho, she confirmed that the sale date is scheduled for July 27, 2012.  Ms. Camacho advised that Quality would need authority from Defendant Nationstar to take any action regarding the loan and the sale date. However, Ms. Camacho did not have a fax or the name of a particular person from Nationstar to offer me.

5.  I have reviewed with the Plaintiffs all the Notices of Trustee's Sale, the Assignments of Deed of Trust, the Deed of Trust, and the Promissory Note which are either recorded in the public records, or filed with the Western District Bankruptcy Court under case number 09-47534 and found numerous defects as well as inconsistencies

1    within, and between these documents.  For example, the Assignment of Deed of Trust

2    from Defendant MERS to Defendant First Horizon Home Loans, a division of First

3    Tennessee Bank, N.A., was dated for 2/13/2009, but not notarized until 3/17/2009.

4    6.    The Plaintiffs' Motion for Temporary Restraining Order is made based on the very

5    documents that have been generated, filed in the public records or in a court of law by

6    the Defendants. These documents directly contradict the Defendants' claims.

7    Amongst them, a) there are no evidence that Quality Loan Service Corp. of

8    Washington, ever been appointed as successor trustee under the DOT; b) the Note

9    produced by McCarthy Holthus, LLP, is unendorsed; c) the first Assignment executed

10   by MERS was in favor of First Horizon Home Loans, a division of First Tennessee

11   Bank, NA, which was purchased by MetLife Home Loans prior to the Assignment

12   being executed and recorded; d) the second Assignment was made in favor of a 2006

13   securitized trust that cannot be located in the SEC's website; e) the second

14   Assignment to the 2006-securitized trust refers to a Pooling and Servicing

15   Agreement, which would reveal the chain of transfer that led to the securitized trust

16   being the owner/holder, but was not produced; f) the second Assignment executed in

17   2012 purportedly transferring rights and interest to a 2006-securitized trust while it is

18   common knowledge that a 2006-securitized trust would have been closed in 2006,

19   and incapable of accepting or including any loans after such date, and g) Nationstar

20   Mortgage LLC executed the second Assignment in its capacity as attorney-in-fact but

21   produced no power of attorney conferring such authority.

22   7.    Given the clear inconsistencies between representations made by McCarthy &

23   Holthus to the Bankruptcy Court and the documents filed in the public records, this

24

tribunal has to be assured of the integrity of the foreclosure sale as being attempted by Quality as the alleged Trustee under the Deed of Trust. Additionally, instruments that prove the existence of an agency are required before the execution of any document by an agent on behalf of his/her principal. None was ever produced by the Defendants.

8. Given how the impending Trustee's Sale is less than 10 days, and the fact that Plaintiffs' home will be lost forever before a determination can be made about whether the Defendants possess the legal right to foreclose, a Temporary Restraining Order is absolutely necessary and should be granted based on these blatant defects. Since a hearing will be scheduled shortly, there is no resulting prejudice to any of the Defendants.

9. As I am filing the Motion, the instant Declaration, and Plaintiff's Declaration in Verification of the Complaint and Motion, I am also serving Defendant Quality as Trustee with a copy of the same, plus a copy of the Complaint and Summons, as filed in court, via fax at 619-568-3574 and USPS Express Mail.

DATED this 17th day of July, 2012.


/s/ Ha Thu Dao
_____
HA THU DAO, Declarant


3501 RUCKER AVE, EVERETT WA 98201
727-269-9334/FAX 727-264-2447
COUNSEL'S DECLARATION– 4

00173

1

2

3

4

5

6

7        IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
         IN AND FOR THE COUNTY OF PIERCE

8

SCOTT TOWSEND & DEBORAH
9    TOWNSEND, husband and wife,
                    Plaintiffs,

10
                                              CASE NO: 12-2-10932-5
     vs.
11

QUALITY LOAN SERVICE CORP. OF
12   WASHINGTON; THE ENTITY KNOWN AS
     "THE BANK OF NEW YORK MELLON,
13   F/K/A THE BANK OF NEW YORK, AS
     TRUSTEE FOR THE HOLDERS OF THE
14   CERTIFICATES, FIRST HORIZON          PLAINTIFF'S DECLARATION IN
     MORTGAGE PASS-THROUGH               VERIFICATION OF COMPLAINT
15   CERTIFICATES SERIES FHAMS 2006-AA6, AND MOTION TO RESTRAIN
     BY FIRST HORIZON HOME LOANS, A       TRUSTEE'S SALE
16   DIVISION OF FIRST TENNESSEE BANK
     NATIONAL ASSOCIATION, MASTER
17   SERVICER, IN ITS CAPACITY AS AGENT
     FOR THE TRUSTEE UNDER THE POOLING
18   AND SERVICING AGREEMENT"; FIRST
     HORIZON HOME LOAN CORPORATION,
19   FIRST HORIZON HOME LOANS, A
     DIVISION OF FIRST TENNESSE BANK,
20   N.A.; MORTGAGE ELECTRONIC
     REGISTRATION SYSTEMS, INC.;
21   NATIONSTAR MORTGAGE LLC.

22                   Defendants.

23

24

       3501 RUCKER AVE, EVERETT WA 98201
       727-269-9334/FAX 727-264-2447
       PLAINTIFF'S DECLARATION

☾ ORIGINAL

00174

1

2       The undersigned, Deborah Towsend, Plaintiff, declares under penalty of perjury under the

3   laws of the State of Washington, that I am familiar with the underlying facts of my case, that I

4   have personally reviewed all statements of fact and documents referred to and set forth in

5   Plaintiffs' Motion to Restrain Trustee's Sale as prepared by my counsel and ascertained that

6   they are true and correct and are made based on my personal knowledge.

7       I declare that my husband, Scott Townsend, and I, as owners the property 1221 14th Ave, Fox

8   Island, which is subject to Trustee's Sale, are moving the Court for an Order Restraining the

9   Trustee's Sale based on the questionable conduct of the Trustee, Quality Loan Service Corp. of

10  Washington, and the doubtful nature of numerous documents that have been filed in the public

11  records and which are being used to facilitate the Trustee's sale of our property.

12      I declare further that I am prepared to testify to the same facts in a court of law.

13      DATED this 16th day of July, 2012.

14

15      *Deborah Townsend*

        DEBORAH TOWNSEND, Plaintiff

16

17

18

19

20

21

22

23

24

3500 RUCKER AVE, EVERETT WA 98201
727-269-9334/FAX 727-264-2447
DECLARATION– 2

00175

1

2

3

4

5

6

7        IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
         IN AND FOR THE COUNTY OF PIERCE

8

SCOTT TOWNSEND & DEBORAH
9   TOWNSEND, husband and wife,
                Plaintiffs,

10

        vs.                                          CASE NO: 12-2-10932-5

11

QUALITY LOAN SERVICE CORP. OF                        DECLARATION OF SERVICE
12   WASHINGTON, et. al.,
                Defendants.

13

14

15

16      I, HA THU DAO, hereby certify that I have caused for the following documents to be served
    upon Defendant Quality Loan Service Corp. of Washington via fax 619-568-3574 and USPS
17   Express Mail 19735 10th Ave NE, Ste N200, Poulsbo, WA 98370, on July 18, 2012:

18   1. Motion to Show Cause as to why Trustee's Sale should not be restrained.
    2. Counsel's Declaration in support of Motion
19   3. Declaration of Plaintiff in Verification of Complaint and Motion
    5. Notice of Hearing
20   6. Certificate of Service

21      DATED this 18th day of July, 2012.

22                              /s/ Ha Thu Dao

23                              HA THU DAO, WSBA#21793

24

3501 RUCKER AVE, EVERETT WA 98201
727-269-9334/FAX 727-264-2447
DECLARATION OF SERVICE

00176

E-FILED
IN COUNTY CLERK'S OFFICE
PIERCE COUNTY, WASHINGTON

July 18 2012 11:08 AM

KEVIN STOCK
COUNTY CLERK
NO: 12-2-10932-5

1

2

3

4

5

6

7                    IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
                          IN AND FOR THE COUNTY OF PIERCE

8

| | |
|---|---|
| SCOTT TOWNSEND & DEBORAH TOWNSEND, husband and wife,<br>                    Plaintiffs,<br><br>              vs.<br><br>QUALITY LOAN SERVICE CORP. OF WASHINGTON, et. al.,<br><br>                    Defendants. | CASE NO: 12-2-10932-5<br><br>**NOTE OF MOTION HEARING ON JUDGE'S CALENDAR**<br><br>The Honorable Edmund Murphy<br>Division 9<br>Motion for Preliminary Injunction<br>Friday 7/27/2012 at 9AM |

9

10

11

12

13

14

15

16

17

**TO:  THE CLERK OF THE COURT** and to all other parties listed on Page 2:

18

**PLEASE TAKE NOTICE** that an issue of law in this case will be heard on the date

19   below and the Clerk is directed to note this issue on the calendar checked below:

20

**Calendar Date: 7/27/2012**              **Day of Week**: Friday

21   **Time: 9:00 a.m.**

22   **Nature of Motion: MOTION FOR ORDER RESTRAINING TRUSTEE'S SALE**

23

24

3501 RUCKER AVE, EVERETT WA 98201
727-269-9334/FAX 727-264-2447
NOTICE OF HEARING

00177

NOTED BY:

_____
HA THU DAO, WSBA#21793
Attorney for Plaintiffs

Names & Service Addresses for all necessary Parties requiring notice:

**Quality Loan Service, Corp. of Washington**

**19735 10th Ave NE, Suite N200**

**Poulsbo, WA 98370**

**Tel: 866-645-7711**

**IMPORTANT NOTICE REGARDING CASES**

Party requesting hearing must file motion & affidavits separately along with this notice.  List the names, addresses and telephone numbers of all parties requiring notice (including GAL) on this page.  Serve a copy of this notice, with motion documents, on all parties.
The original must be filed at the Clerk's Office not less than **six** court days prior to requested hearing date, except for Summary Judgment Motions (to be filed with Clerk 28 days in advance).

THIS IS ONLY A PARTIAL SUMMARY OF THE LOCAL RULES AND ALL PARTIES ARE ADVISED TO CONSULT WITH AN ATTORNEY.

E-FILED
IN COUNTY CLERK'S OFFICE
PIERCE COUNTY, WASHINGTON

July 23 2012 8:30 AM

KEVIN STOCK
COUNTY CLERK
NO: 12-2-10932-5

1

2

3

4

5

6

7     IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
          IN AND FOR THE COUNTY OF PIERCE

8

9   SCOTT TOWNSEND & DEBORAH
    TOWNSEND, husband and wife,
              Plaintiffs,

10

                                        CASE NO: 12-2-10932-5
      vs.
11
                                        CERTIFICATE OF SERVICE
    QUALITY LOAN SERVICE CORP. OF
12  WASHINGTON, et. al.,
              Defendants.

13

14

15

16      I, HA THU DAO, hereby certify that I have caused for the following documents to be served
    upon Defendant Quality Loan Service Corp. of Washington via fax 619-568-3574 and USPS
17  First Mail at 19735 10th Ave NE, Ste N200, Poulsbo, WA 98370, on July 23, 2012:

18   Notice & Supplemental Authority
     Certificate of Service
19
             DATED this 23rd day of July, 2012.
20
                              /s/ Ha Thu Dao
21                           _____

22                           HA THU DAO, WSBA#21793

23

24

3501 RUCKER AVE, EVERETT WA 98201
727-269-9334/FAX 727-264-2447
DECLARATION OF SERVICE

00179

E-FILED
IN COUNTY CLERK'S OFFICE
PIERCE COUNTY, WASHINGTON

July 23 2012 8:30 AM

KEVIN STOCK
COUNTY CLERK
NO: 12-2-10932-5

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF PIERCE

| | |
|---|---|
| SCOTT TOWNSEND & DEBORAH TOWNSEND, husband and wife, Plaintiffs, | |
| vs. | CASE NO: 12-2-10932-5 |
| QUALITY LOAN SERVICE CORP. OF WASHINGTON, et. al., Defendants. | NOTICE OF APPEARANCE |

   PLEASE TAKE NOTICE the undersigned hereby appears on behalf of the Plaintiffs and requests that all pleadings and correspondence regarding the above-entitled matter be served upon her at the address listed herein and at hadaojd@gmai.l.com, electronically.

   DATED this 18th day of July, 2012.

/s/ Ha Thu Dao
_____
HA THU DAO, WSBA#21793

3501 RUCKER AVE, EVERETT WA 98201
727-269-9334/FAX 727-264-2447
DECLARATION OF SERVICE

00180

E-FILED
IN COUNTY CLERK'S OFFICE
PIERCE COUNTY, WASHINGTON

July 23 2012 8:30 AM

KEVIN STOCK
COUNTY CLERK
NO: 12-2-10932-5

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF PIERCE

SCOTT TOWNSEND & DEBORAH
TOWNSEND, husband and wife,
        Plaintiffs,

    vs.

QUALITY LOAN SERVICE CORP. OF
WASHINGTON, et. al.,
        Defendants.

CASE NO: 12-2-10932-5

NOTICE OF FILING
SUPPLEMENTAL AUTHORITY

PLEASE TAKE NOTICE that Plaintiffs are hereby submitting the attached Supplemental Authority issued by Washington Court of Appeals, Division One, and Washington State Supreme Court, as binding authority in the matter being under consideration of this Court:

Albice v. Premier Mortg. Servs., 157 Wn.App. 912, 239 P.3d 1148 (Wa. Ct. App. 2010); aff'd by Albice v. Premier Mortg. Servs., 174 Wn.2d 560, 276 P.3d 1277 (May 24, 2012)

DATED this 23rd day of July, 2012.

/s/ Ha Thu Dao

_____
HA THU DAO, WSBA#21793

3501 RUCKER AVE, EVERETT WA 98201
727-269-9334/FAX 727-264-2447
DECLARATION OF SERVICE

00181



6 of 6 DOCUMENTS

CHRISTA L. ALBICE ET AL., *Appellants*, v. PREMIER MORTGAGE SERVICES OF WASH-INGTON, INC., ET AL., *Defendants*, RON DICKINSON ET AL., *Respondents*.   RON DICK-INSON, *Respondent*, v. CHRISTA L. ALBICE ET AL., *Appellants*.

No. 39265-8-II

COURT OF APPEALS OF WASHINGTON, DIVISION TWO

*157 Wn. App. 912; 239 P.3d 1148; 2010 Wash. App. LEXIS 2199*

May 10, 2010, Oral Argument
September 28, 2010, Filed

**SUBSEQUENT HISTORY:** Review granted by *Albice v. Premier Mortg. Servs. of Wash., Inc., 170 Wn.2d 1029, 249 P.3d 623, 2011 Wash. LEXIS 136 (2011)*
Affirmed by, Remanded by *Albice v. Premier Mortg. Servs. of Wash., Inc., 2012 Wash. LEXIS 378 (Wash., May 24, 2012)*

**PRIOR HISTORY:** [***1]
   Appeal from Mason County Superior Court. Docket No: 07-2-00172-1. Judgment or order under review. Date filed: 04/06/2009. Judge signing: Honorable Toni a Sheldon, David Foscue.

**SUMMARY:**

WASHINGTON OFFICIAL REPORTS SUMMARY

   **Nature of Action:** The owners of property that was sold in foreclosure of a deed of trust encumbering the property sought to set aside the trustee's sale, alleging that the servicer of the loan breached a forbearance agreement with the plaintiffs and that the trustee of the deed breached its fiduciary duties and conducted an improper foreclosure sale. The plaintiffs also sought to quiet title to the property against the purchasers of the property at the trustee's sale. The purchasers counterclaimed to quiet title to the property and crossclaimed against the loan servicer and the deed trustee.

   **Superior Court:** After dismissing the plaintiffs' claims against the loan servicer and the deed trustee, after granting the purchasers' motion to voluntarily dismiss the cross claims against the loan servicer and the deed trustee, and after ruling by summary judgment that

the purchasers held the property as bona fide purchasers for value, the Superior Court for Mason County, No. 07-2-00172-1, Toni A. Sheldon, J., on April 4, 2009, entered a judgment in favor of the purchasers, quieting title to the property to them and awarding them damages and costs.

   **Court of Appeals:** Holding that the sale did not comply with statutory requirements, that the purchaser was not a bona fide purchaser for value, that the trustee's deed failed to state facts that would protect a buyer, that the sale price was inadequate, and that the sale was surrounded by other unfair circumstances, the court *reverses* the judgment.

**HEADNOTES**

WASHINGTON OFFICIAL REPORTS HEADNOTES

**[1] Deeds of Trust -- Nonjudicial Foreclosure -- Statutory Provisions -- Required Procedures.** The deeds of trust act (ch. 61.24 RCW) sets forth the procedures that must be followed to properly foreclose a debt secured by a deed of trust. The notice of a potential foreclosure sale must comply with *RCW 61.24.040.*

**[2] Deeds of Trust -- Nonjudicial Foreclosure -- Effect -- Extinguishing Debt -- Transferring Title.** A deed of trust must be properly foreclosed under the deeds of trust act (ch. 61.24 RCW) before the debt secured by the deed is extinguished and before title to the property encumbered by the trust deed can be transferred to the beneficiary of the trust deed or to the successful bidder at a public foreclosure sale.

Case 3:12-cv-05778-RBL   Document 5   Filed 08/29/12   Page 79 of 100

Page 2

157 Wn. App. 912, *; 239 P.3d 1148, **;
2010 Wash. App. LEXIS 2199, ***

**[3] Deeds of Trust -- Nonjudicial Foreclosure -- Statutory Provisions -- Construction -- Purpose of Act.** Courts construe the deeds of trust act (ch. 61.24 RCW) to further three objectives: (1) to keep the nonjudicial foreclosure process efficient and inexpensive, (2) to provide an adequate opportunity for interested parties to prevent wrongful foreclosure, and (3) to promote the stability of land titles.

**[4] Deeds of Trust -- Nonjudicial Foreclosure -- Statutory Provisions -- Strict Construction.** The nonjudicial foreclosure provisions of the deeds of trust act (ch. 61.24 RCW) are strictly applied and interpreted in favor of the grantor of the trust deed.

**[5] Deeds of Trust -- Nonjudicial Foreclosure -- Statutory Provisions -- Compliance -- Necessity.** A lawful sale of property in foreclosure of a deed of trust encumbering the property must comply with the timing and notice obligations of *RCW 61.24.040*.

**[6] Deeds of Trust -- Nonjudicial Foreclosure -- Trustee -- Duties -- Conveyance of Deed -- Recitation of Facts Showing Compliance With Statutory Requirements -- Necessity.** Under *RCW 61.24.040(7)*, when property is sold in foreclosure of a deed of trust encumbering the property, the trustee must issue a deed that recites facts showing that the sale was conducted in compliance with statutory requirements. A bona fide purchaser is entitled to rely on the deed recitals as to the correctness of the foreclosure sale procedures.

**[7] Appeal -- Disposition of Cause -- Reversal -- Dispositive Issues -- Consideration of Other Issues.** When an appellate court reverses a judgment on the basis of certain dispositive issues, it may decline to consider any other issues in the case.

**[8] Judgment -- Summary Judgment -- Determination -- Single Conclusion From Evidence.** A summary judgment may be granted only if, from all the submissions, reasonable persons could reach but one conclusion.

**[9] Deeds of Trust -- Nonjudicial Foreclosure -- Trustee's Sale -- Deed -- Recital -- Sufficiency.** Where property is sold in foreclosure of a deed of trust, the deed recital required by *RCW 61.24.040(7)* is inadequate if it is impossible to determine from the recital, as a matter of fact, whether the sale took place within statutory time limits or whether the grantor/debtor was actually in default at the time of the sale.

**[10] Statutes -- Construction -- Legislative Intent -- In General.** A statute is construed to give effect to the legislature's intent.

**[11] Statutes -- Construction -- Unambiguous Language -- In General.** When a statute's words are plain and unambiguous, it is applied as written.

**[12] Statutes -- Construction -- Meaning of Words -- Absence of Statutory Definition -- Plain and Ordinary Meaning -- Resort to Dictionary.** When a statutory term is not defined by the statute, it is given its plain and ordinary meaning as ascertained from a standard dictionary.

**[13] Deeds of Trust -- Nonjudicial Foreclosure -- Trustee's Sale -- Deed -- Recital -- What Constitutes.** For purposes of *RCW 61.24.040(7)*, which requires that the deed issued to the purchaser of property sold in foreclosure "recite the facts showing that the sale was conducted in compliance with all of the requirements of [the deeds of trust act, chapter 61.24 RCW] and of the deed of trust," a "recital" is a formal statement or setting forth of relevant matters of fact; i.e., the statute requires the trustee to recite facts in the deed showing compliance with the requirements of the deeds of trust act. Legal conclusions without supporting facts are insufficient to demonstrate that the sale complied with all the statutory procedural protections.

**[14] Property -- Authority -- Washington Real Property Deskbook.** The Washington State Bar Association's *Washington Real Property Deskbook* is not authority a court is bound to follow.

**[15] Deeds of Trust -- Nonjudicial Foreclosure -- Trustee's Sale -- Deed -- Recital -- Conflict With Facts -- Effect.** When the deed issued to the purchaser of property in a trustee's sale contains recitals of regularity on the face of the deed but the deed also sets forth facts that are inconsistent with the recitals, the recitals are invalid. A trustee's legal conclusions that are contrary to the actual facts of the foreclosure process are not conclusive if an accurate reporting of the facts would show the legal conclusions to be incorrect. Conclusory recitals of compliance with statutory requirements, as distinguished from recitals of fact demonstrating compliance, deprive grantors of trust deeds of the protections afforded by the deeds of trust act (ch. 61.24 RCW).

**[16] Deeds of Trust -- Nonjudicial Foreclosure -- Trustee's Sale -- Deed -- Recital -- Factual Averments -- Necessity.** Under *RCW 61.24.040(7)*, the deed issued to the purchaser of property in a trustee's sale must recite the statutorily mandated facts of the loan-default proce-

Case 3:12-cv-05778-RBL   Document 5   Filed 08/29/12   Page 80 of 100

Page 3

157 Wn. App. 912, *; 239 P.3d 1148, **;
2010 Wash. App. LEXIS 2199, ***

dure. A deed that contains legal conclusions but not factual recitals does not comply with *RCW 61.24.040(7)*. A trustee's failure to recite any facts about the protections afforded by the deeds of trust act (ch. 61.24 RCW) deprives the purchaser of the protections of *RCW 61.24.040(7)*.

**[17] Limitation of Actions -- Deeds of Trust -- Nonjudicial Foreclosure -- Trustee's Sale -- Continuance -- Trustee's Authority -- Reliance on Mutual Agreement -- Effect.** *RCW 61.24.040(6)* grants a trustee of a deed of trust the authority to continue a sale in foreclosure for any cause the trustee deems advantageous. The trustee's reliance on a "mutual agreement" in postponing a sale is immaterial in light of the statutory authority. Absent an agreement restricting continuances of the sale, the grounds for continuing the sale are immaterial under the trustee's statutory authority.

**[18] Limitation of Actions -- Deeds of Trust -- Nonjudicial Foreclosure -- Trustee's Sale -- Continuance -- Limitation Period.** Under *RCW 61.24.040(6)*, a trustee's sale of property in foreclosure of a deed of trust may not be continued beyond 120 days after the date the sale was originally scheduled. After 120 days have elapsed since the sale was originally scheduled, the trustee's right to conduct the original sale is extinguished and a sale occurring after that date is void.

**[19] Deeds of Trust -- Nonjudicial Foreclosure -- Bona Fide Purchaser -- Who Qualifies -- In General.** A bona fide purchaser at a trustee's sale in foreclosure of a deed of trust is one who purchases the property without actual or constructive knowledge of competing interests and who pays the trustee valuable consideration. A purchaser is on notice if the purchaser has knowledge of facts sufficient to put an ordinarily prudent person on inquiry and a reasonably diligent inquiry would lead to the discovery of title or sale defects. A purchaser is not a bona fide purchaser if the events surrounding the sale created a duty by the purchaser to inquire into possible flaws in the foreclosure process.

**[20] Deeds of Trust -- Nonjudicial Foreclosure -- Bona Fide Purchaser -- Who Qualifies -- Factors -- Real Estate Investment Experience.** In determining whether a purchaser of property at a trustee's sale in foreclosure of a deed of trust qualifies as a bona fide purchaser, a court will give substantial weight to the purchaser's real estate investment experience.

**[21] Deeds of Trust -- Nonjudicial Foreclosure -- Bona Fide Purchaser -- Who Qualifies -- Factors -- Extensive Familiarity With Foreclosure Process.** When a purchaser of property at a trustee's sale in foreclosure of a deed of trust has extensive familiarity with the foreclosure process, such familiarity provides context for assessing whether certain facts put the purchaser on notice to inquire into possible flaws in the foreclosure process.

**[22] Deeds of Trust -- Nonjudicial Foreclosure -- Bona Fide Purchaser -- Who Qualifies -- Factors -- Low Purchase Price in Relation to Grantor's Equity.** For purposes of determining whether a purchaser of property at a trustee's sale qualifies as a bona fide purchaser, a markedly low sale price in relation to the substantial equity in the property held by the grantor of the trust deed is a factor that may be considered in determining whether the purchaser was on notice to inquire into possible flaws in the foreclosure process. Although a foreclosure sale price less than the fair market value is not an irregularity, an inadequate purchase price can be a factor that puts a purchaser on notice of another party's claim of right to, or equity in, the property.

**[23] Deeds of Trust -- Nonjudicial Foreclosure -- Bona Fide Purchaser -- Who Qualifies -- Factors -- Delayed Sale.** For purposes of determining whether a purchaser of property at a trustee's sale qualifies as a bona fide purchaser, a long delay between when the sale was first scheduled and when it was finally conducted is a factor that may be considered in determining whether the purchaser was on notice to inquire into possible flaws in the foreclosure process.

**[24] Deeds of Trust -- Nonjudicial Foreclosure -- Trustee's Sale -- Deficient Bid -- Voiding of Sale on Equitable Grounds.** While the inadequacy of the price paid for property sold to foreclose a deed of trust is not, alone, a sufficient ground to set aside the sale, a grossly inadequate purchase price together with circumstances of other unfair procedures may provide equitable grounds to set aside a sale.

**[25] Deeds of Trust -- Nonjudicial Foreclosure -- Defect -- Prejudice -- Necessity.** When the grantor of a deed of trust seeks to void the trustee's sale of the property in foreclosure of the trust deed and the trustee's violations in conducting the sale are technical, the grantor must show that the circumstances surrounding the sale unfairly harmed or prejudiced the grantor.

**[26] Deeds of Trust -- Nonjudicial Foreclosure -- Defect -- Chilled Bidding -- What Constitutes -- Effect.** Actions by the trustee of a deed of trust in conducting a foreclosure sale of the property that effectively suppress competitive bidding need not be intentional to warrant relief from the sale. Chilled bidding may constitute unfair circumstances surrounding the sale where the trustee's continuances and delayed start of the actual bidding

Case 3:12-cv-05778-RBL   Document 5   Filed 08/29/12   Page 81 of 100

Page 4

157 Wn. App. 912, *; 239 P.3d 1148, **;
2010 Wash. App. LEXIS 2199, ***

likely chilled the bidding process by reducing the number of potential bidders and where the winning bidder paid only a fraction of the amount the bidder was prepared to pay for the property.

**[27] Deeds of Trust -- Nonjudicial Foreclosure -- Trustee's Sale -- Questionable Circumstances Surrounding Sale -- Voiding of Sale on Equitable Grounds.** The circumstances surrounding a debtor's attempts to save a substantial equity position in property encumbered by a deed of trust securing the debt can constitute circumstances warranting the setting aside of the trustee's sale of the property on equitable grounds. A trustee is not required to obtain the best possible price for the property; nonetheless, a trustee must take reasonable and appropriate steps to avoid sacrificing the grantor's interest in the property secured by a deed of trust.

**COUNSEL:** *Douglas N. Kiger* and *Jonathan W. Blado* (of *Blado Kiger PS*), for appellants.

*Richard L. Ditlevson* (of *Ditlevson Rodgers Dixon PS*), for respondents.

**JUDGES:** AUTHOR: David H. Armstrong, J. We concur: Joel Penoyar, C.J., Lisa Worswick, J.

**OPINION BY:** David H. Armstrong

**OPINION**

[*917]  [**1151] ¶1 ARMSTRONG, J. -- Christa Albice and Karen and Bart Tecca (Albice/Teccas) appeal the trial court's refusal to set aside a nonjudicial deed of trust foreclosure sale of their property. They argue that (1) the successful bidder at the foreclosure sale was not a bona fide purchaser; (2) even if he was, the trustee's deed failed to report procedural facts that would statutorily protect a buyer; (3) the sale was void for taking place beyond the statutorily limited time frame; (4) the Teccas timely tendered funds sufficient to cure the loan default and require the trustee to discontinue the sale; and (5) the trustee lacked authority to conduct the sale because it had no corporate officer residing in Washington at the time of the sale.  [***2] We hold that the sale did not comply with statutory requirements, that the purchaser was not a bona fide purchaser for value, that the trustee's deed failed to state facts that would protect a buyer, that the sale price was inadequate, and that the sale was surrounded by other unfair circumstances. Accordingly, we reverse.

FACTS

A. Background

¶2 Christa Albice and Karen and Bart Tecca owned improved real property on Hartstine Island in Mason County.  [*918]  Sisters Albice and Tecca inherited the 10-acre property from their parents free of any liens or encumbrances.

¶3 In 2003, the Teccas borrowed $ 115,500 against the property secured by a deed of trust. The loan was serviced through a subsidiary of H&R Block known as Option One Mortgage Corporation. Premier Mortgage Services of Washington, also a subsidiary of H&R Block, was the trustee of the deed of trust. [1]

> 1   The exact nature of the relationship between Option One and Premier is unclear. The trial court concluded that Option One was affiliated with Premier. Our reading of the record suggests an even stronger connection. Lisa Clary, an Option One employee designated as the representative of Premier in this action, described [***3] as Option One's "in-house trust deed service," handling all of Options One's foreclosures in Washington State at the relevant time. Clerk's Papers (CP) at 239-56. She explained that Option One monitored Premier's work and that both corporations accessed all loan information from a shared database. Michael Crockett, a licensed private investigator, stated that Premier is actually Option One.

¶4 The Teccas fell delinquent on their loan payments to Option One in April 2006. Premier issued a "Notice of Foreclosure" and a "Notice of Trustee Sale," informing the Teccas that it would hold a foreclosure sale on September 8, 2006. The Teccas contacted Option One to find out how to cure the delinquent payments and avoid foreclosure.

¶5 In July 2006, the Teccas and Option One entered into a forbearance agreement. The agreement stated that the Teccas owed $ 5,126.97 to bring the loan current. The Teccas agreed to a down payment of $ 3,000.00 and increased monthly payments, to be paid by the 16th of every month, through January 2007. On September 8, 2006, the crier of the sale announced that Premier was postponing the foreclosure sale. [2]

> 2   The sale was continued six times before the final sale took place.

¶6 The  [***4] Teccas made the down payment and, although late, made each of the subsequent monthly payments. The Teccas tendered the final payment, which was due on January 16, on February 2, 2007. On February 10, 2007, they received notice from Western Union that Option One  [*919]  had refused to accept their

Case 3:12-cv-05778-RBL   Document 5   Filed 08/29/12   Page 82 of 100

Page 5

157 Wn. App. 912, *; 239 P.3d 1148, **;
2010 Wash. App. LEXIS 2199, ***

final payment. Western Union refunded the final payment on February 16, 2007. [3]

> 3   According to legal counsel for Option One, a letter was sent to the Teccas on January 31, 2007, declaring breach of contract for nonpayment under the terms of the forbearance agreement and notifying them that the foreclosure proceedings would continue without further demand. Karen Tecca claims she never received written notice that they were in breach of contract.

[**1152] ¶7 On February 16, 2007, Premier conducted a foreclosure sale of the property, 161 days after the original sale date set in the Notice of Trustee Sale. Through an agent, Ron Dickinson successfully bid $ 130,000 for the property.

B. Procedural History

¶8 Albice/Teccas sued Premier, Option One, and the Dickinsons, seeking to set aside the foreclosure sale. They alleged that Option One breached the forbearance agreement with the Teccas and that Premier breached its fiduciary [***5] duty owed to the Teccas and conducted an improper foreclosure sale. Against the Dickinsons, Albice/Teccas sought to quiet title to the property. The Dickinsons counterclaimed to quiet title and filed cross claims against Option One and Premier. [4]

> 4   The trial court dismissed Albice/Teccas' claims against Premier and Option One because of an arbitration agreement the Teccas signed. The trial court granted the Dickinsons' motion to voluntarily dismiss the cross claims against Premier and Option One.

¶9 The Dickinsons moved for summary judgment to establish that Ron Dickinson was a bona fide purchaser of the property and therefore entitled to quiet title. Albice/Teccas also moved for summary judgment, arguing that the foreclosure sale should be set aside as void because (1) Premier was not a qualified trustee with authority to conduct the sale and (2) the sale occurred after the statutory deadline. The trial court granted the Dickinsons' motion, ruling that Ron Dickinson was a bona fide purchaser for value. The court held that even though the sale was continued for more than 120 days in violation of RCW 61.24.040(6), Ron Dickinson's bona fide purchaser status rendered the deed's recitals of [***6] compliance with the statute conclusive evidence that the sale was proper.

[*920] ¶10 After two rulings on Premier's qualification to act as a trustee in Washington State and subsequent motions for reconsideration, the parties tried the issue. Following a bench trial, the court ruled that Prem-

ier was eligible to serve as a trustee under Washington law. Accordingly, the court quieted title in favor of the Dickinsons and awarded them damages and costs.

ANALYSIS

I. WASHINGTON DEED OF TRUST ACT

[1, 2] ¶11 The deeds of trust act (Act) sets out the procedures that must be followed to properly foreclose a debt secured by a deed of trust. Ch. 61.24 RCW. A proper foreclosure action extinguishes the debt and transfers title to the property to the beneficiary of the deed of trust or to the successful bidder at a public foreclosure sale. In re Marriage of Kaseburg, 126 Wn. App. 546, 558, 108 P.3d 1278 (2005).

[3, 4] ¶12 We construe the Act to further three objectives: (1) the nonjudicial foreclosure process should remain efficient and inexpensive, (2) the process should provide an adequate opportunity for interested parties to prevent wrongful foreclosure, and (3) the process should promote the stability of land titles. Cox v. Helenius, 103 Wn.2d 383, 387, 693 P.2d 683 (1985). [***7] In addition, because nonjudicial foreclosures lack the oversight inherent in judicial foreclosures, we strictly apply and interpret the Act in the borrower's favor. CHD, Inc. v. Boyles, 138 Wn. App. 131, 137, 157 P.3d 415 (2007).

[5] ¶13 A lawful foreclosure sale must comply with the timing and notice obligations of RCW 61.24.040. For example, a trustee may, for any cause the trustee deems advantageous, continue the sale for not more than a total of 120 days. RCW 61.24.040(6). And at any time prior to the 11th day before the sale, the borrower is entitled to cure the default set forth in the notice. RCW 61.24.090(1). Upon [*921] receipt of such payment, the trustee must discontinue the sale and reinstate the deed of trust. RCW 61.24.090(3).

[6] ¶14 To balance the procedural safeguards with the interests of a purchaser, the Act requires a foreclosing trustee to issue a deed that recites facts showing that the sale was conducted in compliance with statutory requirements. RCW 61.24.040(7). A bona fide purchaser is entitled to rely on these recitals as to the correctness of foreclosure [**1153] sale procedures. RCW 61.24.040(7); Glidden v. Mun. Auth. of Tacoma, 111 Wn.2d 341, 347, 758 P.2d 487 (1998).

II. STATUTORY DEFECTS [***8] IN THE SALE

[7] ¶15 Albice/Teccas argue that the trustee's failure to comply with certain statutory requirements renders the sale void. First, they claim that Premier had no authority to conduct the sale 161 days after the original sale date under RCW 61.24.040(6). Next, they claim that because they tendered funds sufficient to cure the default, the

Case 3:12-cv-05778-RBL   Document 5   Filed 08/29/12   Page 83 of 100

Page 6

157 Wn. App. 912, *; 239 P.3d 1148, **;
2010 Wash. App. LEXIS 2199, ***

trustee should have discontinued the sale under *RCW 61.24.090(3)*. [5] In addition, they assert that the recitals contained in the trustee's deed are "inadequate to demonstrate compliance with the statute." Br. of Appellants at 15, 18.

    5   Albice/Teccas also argue that Premier lacked authority to conduct the foreclosure sale because it did not qualify as a trustee under the Act without a corporate officer residing in Washington at the time of the sale. *RCW 61.24.010(1)(a)*. Because we reverse on other grounds, we decline to address this issue.

¶16 The Dickinsons counter that as bona fide purchasers for value, they are protected by the recitals in the deed of trust, which serve as conclusive evidence of a procedurally correct sale under *RCW 61.24.040(7)*. [6]

    6   The Dickinsons contend that Albice/Teccas cannot, for the first time on appeal, argue that they tendered [***9] funds sufficient to cure the default prior to the sale or that the trustee's deed contained insufficient recitals. But both issues were before the court on summary judgment. Albice/Teccas argued that they tendered the final amount due to the lender 14 days prior to the sale in their original motion for summary judgment. The Dickinsons argued that "Dickinson, as a bona fide purchaser for value, was entitled to rely on the recitals made by the trustee in the deed." CP at 545. In reviewing summary judgment, we engage in the same inquiry as the trial court. *Morin v. Harrell, 161 Wn.2d 226, 230, 164 P.3d 495 (2007)*. Whether the recitals in the deed of trust are sufficient for Dickinson to rely on is a necessary step in deciding whether Dickinson is entitled to the protection of *RCW 61.24.040(7)*.

[*922] ¶17 We hold that the conclusional recitals in the deed of trust do not protect the Dickinsons from undisputed defects in the sale because they do not meet the statutory requirement of "facts showing" compliance with *chapter 61.24 RCW*. In addition, regardless of the sufficiency of the recitals, we hold that Dickinson was not a bona fide purchaser entitled to protection under *RCW 61.24.040(7)*.

A. Standard [***10] of Review

[8] ¶18 On summary judgment, the trial court ruled that even though the sale was continued for more than 120 days in violation of *RCW 61.24.040(6)*, Dickinson's bona fide purchaser status rendered the deed's recitals conclusive evidence that the sale was proper. We review a summary judgment de novo. *Hisle v. Todd Pac. Shipyards Corp., 151 Wn.2d 853, 860, 93 P.3d 108 (2004)*.

Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *CR 56(c)*. We consider all facts and reasonable inferences from them in the light most favorable to the nonmoving party. *City of Lakewood v. Pierce County, 144 Wn.2d 118, 125, 30 P.3d 446 (2001)*. The trial court can grant the motion only if, from all the evidence, reasonable persons could reach but one conclusion. *Wilson v. Steinbach, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982)*.

B. Sufficiency of Recitals

¶19 The trustee's deed recites information about the underlying debt obligation, the failure to cure the default, the lender's request to sell the property, and the fulfillment of notice requirements prior to the sale. The deed also recites that "[a]ll legal requirements and all provisions [***11] of said Deed of Trust have been complied with, as to acts to be performed and notices to be given, as provided in *Chapter 61.24 RCW*.? Clerk's Papers (CP) at 450.

[*923] [9] ¶20 Notably absent in the trustee's deed is any mention of the six continuances. Although the original sale date was September 8, 2006, the trustee's deed states that the original sale date on the Notice of Trustee Sale was "02/16/2007" (which was the actual sale date). CP at 444, 450. Nor does the trustee's deed mention the forbearance agreement or any of the make-up payments, including the tender of the last payment, which, although late, would have cured the [**1154] original default if accepted. The trustee's deed tells none of this story, reciting simply that "[a]ll legal requirements and all provisions of [*chapter 61.24 RCW*] have been complied with" and that the original default had not been cured more than 11 days before the final sale. [7] CP at 450. These conclusional recitals make it impossible to determine, as a matter fact, whether the sale took place within the statutorily required time or whether the borrowers were actually in default at the time of the sale.

    7   In fact, the final payment arguably triggered the statute that requires a trustee to [***12] discontinue a sale where the borrower tenders a cure for the default 11 days before the sale. *RCW 61.24.090(3)*. Even if the Teccas were short the trustee's expenses as required by *RCW 61.24.090(1)(b)*, under the forbearance agreement the trustee had a fiduciary duty to notify the Teccas of any additional costs or fees due after they tendered the last payment more than 11 days before the scheduled sale. *RCW 61.24.090(1)(a), (3)*.

Case 3:12-cv-05778-RBL   Document 5   Filed 08/29/12   Page 84 of 100

Page 7

157 Wn. App. 912, *; 239 P.3d 1148, **;
2010 Wash. App. LEXIS 2199, ***

1. Purpose of Recitals

[10-12] ¶21 We construe a statute to give effect to the legislature's intent. *Udall v. T.D. Escrow Servs., Inc., 159 Wn.2d 903, 909, 154 P.3d 882 (2007)*. Where the statute's words are plain and unambiguous, we apply the statute as written. *Enter. Leasing, Inc. v. City of Tacoma, Fin. Dep't, 139 Wn.2d 546, 552, 988 P.2d 961 (1999)*. We also, when possible, give effect to every word, clause, and sentence of a statute. *Cox, 103 Wn.2d at 387*. In the absence of a term's statutory definition, we give the term its plain and ordinary meaning ascertained from a standard dictionary. *Am. Cont'l Ins. Co. v. Steen, 151 Wn.2d 512, 518, 91 P.3d 864 (2004)*.

[13] ¶22 The Act requires the foreclosing trustee to issue to the purchaser a deed that

> [*924] shall recite *the facts showing* that the sale was [***13] conducted in compliance with all of the requirements of this chapter and of the deed of trust, which recital shall be prima facie evidence of such compliance and conclusive evidence thereof in favor of bona fide purchasers and encumbrancers for value.

*RCW 61.24.040(7)* (emphasis added). *Webster's Dictionary* defines "recital" as "the formal statement or setting forth of some relevant matter of fact in a deed or legal document." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1895 (2002). The statute unambiguously requires the trustee to recite facts in its deed showing compliance with the requirements of the chapter. Legal conclusions without supporting facts are insufficient to demonstrate that the sale complied with all the statutory procedural protections.

[14-16] ¶23 The Dickinsons point to the fact that the recitals contained in the trustee's deed are virtually identical to the form deed recommended by the Washington State Bar Association in 4 *Washington Real Property Deskbook* § 47.11(16) (3d ed. Supp. 2001). The deskbook, however, is not authority we are bound to follow. Had the trustee correctly identified the original sale date on the Notice of Trustee Sale, the deed would have [***14] contained inconsistent recitals--that the sale was continued for a period exceeding 120 days contrary to, not in compliance with, the terms of the statute. And had the trustee reported that Option One and the Teccas had executed a forbearance agreement under which the Teccas had actually paid all or most of the original delinquency, the recitals would have been, at the very least, seriously misleading as to whether the *original default* had been cured. [8] California courts have held that where recitals of regularity appear on the face of the deed but the deed also sets forth facts which are inconsistent with that recital, the deed is void on the basis that the recitals are not valid. *Dimock v. Emerald Props. LLC, 81 Cal. App. 4th 868, 877, 97 Cal. Rptr. 2d 255 (2000)* [*925] (citing *Little v. CFS Serv. Corp., 188 Cal. App. 3d 1354, 1359, 233 Cal. Rptr. 923 (1987)*). We agree with this reasoning. We are unwilling to accept a trustee's legal conclusions contrary to the actual facts of the foreclosure process as conclusive evidence where an accurate reporting of the facts would have shown the legal conclusions to be incorrect.

  8  Notably, Option One's alleged letter of January 31 notified the Teccas [***15] that the February 16 sale would take place because they had breached the *forbearance agreement*, not the original note.

[**1155] ¶24 Moreover, a trustee's bald statements that he or she has complied with the law, as distinguished from recitals of fact demonstrating such compliance, tend to dilute the statutory protections afforded borrowers by the Act. [9] See *Rosenberg v. Smidt, 727 P.2d 778, 786 (Alaska 1986)*. While the purpose of *RCW 61.24.040(7)* is to enhance the reliability of land titles, conclusional recitals do so at the borrowers' expense. A conclusional recital in a trustee's deed requires little effort or oversight by the trustee yet it severely limits a borrower's ability to obtain postsale relief. *Rosenberg, 727 P.2d at 786* (noting that although factual recitals do not always protect against fraud, they tend to prevent more common failings of oversight and neglect). In contrast, requiring the trustee to recite the statutorily mandated facts of the loan-default procedure strikes the appropriate balance between the competing interests of all the parties. Where, as here, the deed contains legal conclusions but not factual recitals that establish compliance with *RCW 61.24.040(7)*, we decline [***16] to extend protection to a purchaser beyond what the legislature clearly intended. We emphasize that the problem here is not that the recitals are wrong or misleading; rather, it is the trustee's failure to recite *any facts* triggering the protections afforded by *chapter 61.24 RCW*. We hold that the Dickinsons are unable to claim the protections of *RCW 61.24.040(7)*; i.e., that the trustee's sale occurred within the statutorily required time and that the original defaults had not been cured. We next [*926] consider whether at least one of these flaws renders the sale void.

  9  Washington State already affords purchasers broader protections than many other states by providing a conclusive presumption of compliance in favor of bona fide purchasers in all aspects of foreclosure. Grant Nelson & Dale Whitman, *Reforming Foreclosure: The Uniform Non-*

Case 3:12-cv-05778-RBL    Document 5    Filed 08/29/12    Page 85 of 100

Page 8

157 Wn. App. 912, *; 239 P.3d 1148, **;
2010 Wash. App. LEXIS 2199, ***

*judicial Foreclosure Act*, 53 DUKE L.J. 1399,
1505 (2004).

## 2. Sale Void Beyond 120 Days

¶25 The Dickinsons argue that the original sale was
suspended subject to the forbearance agreement between
the Teccas and Option One and that this does not violate
the statute, which prohibits *a trustee* from continuing a
sale for more than 120 days. Indeed, the forbearance
agreement [***17] contains the following provision:

> In the event that a foreclosure action is
> pending relating to the Loan at the time
> this Agreement becomes effective ... the
> foreclosure action will not be dismissed,
> but the Lender shall use its best efforts to
> ensure that the foreclosure is placed on
> hold pending satisfaction by Borrowers of
> the terms of this Agreement. Lender shall
> retain the right to continually postpone the
> foreclosure ... or otherwise take any action
> reasonably necessary to maintain the
> "pending" status of the foreclosure action
> during the term of this Agreement.

CP at 467. Each time the sale was continued, the crier of
the sale attributed the postponement to a "mutual agree-
ment.? CP at 358-59.

[17] ¶26 *RCW 61.24.040(6)* grants a trustee authori-
ty to continue a sale for any cause the trustee deems ad-
vantageous. *Wells Fargo Bank Minn. v. Vincent, 124 Wn.
App. 1, 3-4, 93 P.3d 173 (2004)*. In *Vincent*, the court
reasoned that the statute's plain language renders imma-
terial a trustee's reliance on "mutual agreement" when
postponing a sale. *Vincent, 124 Wn. App. at 4 n.5*. There,
the court held that absent an agreement to the contrary,
the terms of the statute granted the trustee authority to
[***18] continue the sale. *Vincent, 124 Wn. App. at 3-4*.
Here, the Teccas did not contest Premier's or Option
One's ability to continue the sale. Following *Vincent*,
without an agreement restricting continuances of the
sale, the grounds for continuing the sale [*927] were
immaterial under the trustee's statutory authority. [10] We
next consider whether the 120-day limit in *RCW
61.24.040(6)* divests a trustee of all authority [**1156]
to sell the property such that a sale after the 120 days is
void.

10   The forbearance agreement appears to per-
mit indefinite continuances. *See* CP at 467
("Lender shall retain the right to continually
postpone the foreclosure ... ."). But a contract that
conflicts with statutory requirements is unenfor-

ceable as a matter of law. *Pierce County v. State,
144 Wn. App. 783, 841, 185 P.3d 594 (2008)*.
Regardless of the terms in the agreement, Premier
did not have the authority to continue the sale
beyond the 120-day statutory limit.

[18] ¶27 A plain reading of the statute unambi-
guously limits what is otherwise unfettered discretion of
the trustee to continue a sale. *RCW 61.24.040(6)* (trustee
may "continue the sale for a period or periods *not ex-
ceeding a total of one hundred twenty days*" (emphasis
added)). [***19] Thus, one factor courts address in
determining the validity of a sale is whether the sale oc-
curred within 120 days. In *Felton v. Citizens Federal
Savings & Loan Ass'n of Seattle, 101 Wn.2d 416, 424-25,
679 P.2d 928 (1984)*, although the trustee sale occurred
more than three months after it was originally scheduled,
in breach of an agreement, the court upheld the validity
of the sale because the borrowers requested the delay and
the sale occurred within the 120 days allowed by *RCW
61.24.040(6)*. *See also In re Bell, 386 B.R. 282, 289
(W.D. Wash. 2008)* (holding that a trustee sale postponed
by oral notice complied with the Act where it was con-
tinued by public proclamation for less than a total of 120
days). Conversely, in *Bingham v. Lechner, 111 Wn. App.
118, 131, 45 P.3d 562 (2002)*, the court addressed the
effect of exceeding the 120-day limit. There, the trustee
argued that the statute of limitations on enforcing pay-
ment of a loan did not bar him from reinstituting forec-
losure proceedings. *Bingham, 111 Wn. App. at 127-28*.
He claimed that the statute of limitations tolled, and nev-
er restarted, when the original foreclosure proceedings
were initiated. *Bingham, 111 Wn. App. at 127*. The court,
[***20] relying on *RCW 61.24.040(6)*, held that the
trustee was entitled to continue the initial sale for 120
days, during which time the statute of limitations tolled.
*Bingham, 111 Wn. App. at 131*. But the [*928] court
concluded that after 120 days, the trustee's right to con-
duct the original sale extinguished, restarting the statute
of limitations. *Bingham, 111 Wn. App. at 131*. We agree
that this provision divests a trustee of authority to con-
duct a sale more than 120 days from the date in the No-
tice of Trustee Sale.

¶28 In the absence of specific facts in the trustee's
deed showing that the trustee held the sale within 120
days, including continuances, *RCW 61.24.040(7)* does
not protect Dickinson from a showing to the contrary.
The trustee held the sale 161 days after the date set forth
in the Notice of Trustee Sale, well beyond the statutorily
mandated 120-day limit. Accordingly, the sale was void.
[11]

11   Because this procedural flaw renders the
sale void, we need not consider whether it is also
void because the trustee failed to set forth facts in

Case 3:12-cv-05778-RBL   Document 5   Filed 08/29/12   Page 86 of 100

Page 9

157 Wn. App. 912, *; 239 P.3d 1148, **;
2010 Wash. App. LEXIS 2199, ***

the deed showing the true status of the Teccas' default, if any.

## C. Bona Fide Purchaser Status

**[19-23]** ¶29 Even if the recitals were sufficient, Dickinson is unable to rely on the [***21] protection of *RCW 61.24.040(7)* because he was not a bona fide purchaser for value. Without such protections, the undisputed statutory defects in the sale, as demonstrated above, render the sale void.

¶30 Albice/Teccas argue that Dickinson was not a bona fide purchaser because (1) he knew or should have known about the defects in the sale and (2) the purchase price was substantially below the property's fair market value. Specifically, they argue the following circumstances gave Dickinson notice of flaws in the foreclosure proceedings: (1) Dickinson was "intimately familiar with real estate investment and the non-judicial foreclosure process"; (2) from experience, Dickinson knew foreclosure sales are usually continued for 30 days; (3) Dickinson spoke with Karen Tecca, who told him that they had no interest in selling, that the sale was not going to happen, and that they were "going to make up the payments"; and (4) Dickinson was "surprised" when the property came up for sale. Br. of [*929] Appellants at 19-20. Albice/Teccas further argue that a reasonably diligent inquiry would have revealed that the Teccas had entered into a forbearance agreement under which they had made all their payments and [***22] that the sale had been continued for a period beyond what was statutorily allowed.

¶31 The Dickinsons counter that postponing the sale beyond 120 days did not put Dickinson on notice of any procedural defects. They claim that Dickinson did not know, nor should he be expected to know, [**1157] about the 120-day statutory limit on continuances. They also argue that Dickinson's conversation with Karen Tecca produced no information creating actual or constructive notice of defects in the sale process and that Tecca merely declined an offer to purchase the property.

¶32 A bona fide purchaser is one who purchases property without actual or constructive knowledge of competing interests and pays the vendor valuable consideration. *Glidden, 111 Wn.2d at 350*; *Glaser v. Holdorf, 56 Wn.2d 204, 209, 352 P.2d 212 (1960)*. A purchaser is on notice if he has knowledge of facts sufficient to put an ordinarily prudent man on inquiry and a reasonably diligent inquiry would lead to the discovery of title or sale defects. *Steward v. Good, 51 Wn. App. 509, 513, 754 P.2d 150 (1988)* (quoting *Peterson v. Weist, 48 Wash. 339, 341, 93 P. 519 (1908)*). We must therefore determine whether the events surrounding the sale created a duty [***23] on Dickinson's part to inquire

into possible flaws in the foreclosure process. *See Glidden, 111 Wn.2d at 350-51*. A combination of factors convinces us that Dickinson had a duty to further investigate the circumstances of the sale.

¶33 We give substantial weight to a purchaser's real estate investment experience when determining whether a purchaser had inquiry notice. *Compare Steward, 51 Wn. App. at 513* (noting that the bona fide purchasers had little real estate investing experience at the time of the sale), *with Miebach v. Colasurdo, 102 Wn.2d 170, 176, 685 P.2d 1074 (1984)* (holding that the purchaser with 23 years of investment [*930] experience was not a bona fide purchaser). Dickinson is in the business of investing in real estate. Of his 13 properties in Washington, he purchased the majority through nonjudicial foreclosure sales. By the time of the sale at issue, Dickinson had attended over 35 foreclosure sales. He stated that he had familiarized himself with various Washington foreclosure laws as a necessity for conducting his business. Thus, even without specific knowledge of statutory requirements for a proper sale, Dickinson's familiarity with the foreclosure process provides context for [***24] assessing whether certain facts put him on notice.

¶34 Before the actual sale, Dickinson approached Karen Tecca and asked if she was interested in selling him the property directly. According to Dickinson, Tecca responded that she was not interested in selling the property and never would be. In light of this conversation, Dickinson claimed that he was surprised when the property came up for auction. Moreover, on the original sale date, Dickinson learned that the sale was being continued; he obviously tracked the continuances through to the actual sale 161 days later. In *Miebach, 102 Wn.2d at 176-77*, the purchaser drove by the sale property twice and once knocked on the door, noticing a permit for improvements on the door. The court found these circumstances, coupled with an inadequate purchase price, sufficient to alert a prudent purchaser of the need to further investigate the sale. *Miebach, 102 Wn.2d at 176-77*. Dickinson's personal encounter with Karen Tecca should have similarly raised his suspicions regarding the circumstances of the foreclosure. That he was surprised when the property came up for auction reinforces our conclusion that Dickinson had a duty to confirm the status of [***25] the default.

¶35 Here too, the sale price was markedly low in comparison to the Albice/Teccas' substantial equity in the [*931] property. [12] A sale price less than the fair market [**1158] value at a foreclosure proceeding is not an irregularity. *See BFP v. Resolution Trust Corp., 511 U.S. 531, 538-39, 114 S. Ct. 1757, 128 L. Ed. 2d 556 (1994)*. But an inadequate purchase price can be a factor that puts a purchaser on notice of another party's claim of

Case 3:12-cv-05778-RBL Document 5 Filed 08/29/12 Page 87 of 100

Page 10

157 Wn. App. 912, *; 239 P.3d 1148, **;
2010 Wash. App. LEXIS 2199, ***

right to, or equity in, the property. *See Casa del Rey v. Hart, 110 Wn.2d 65, 72, 750 P.2d 261 (1988); Miebach, 102 Wn.2d at 176-77*. The low auction price relative to the fair market value should have alerted Dickinson to the discrepancy between the underlying debt obligation and the Albice/Teccas' remaining equity in the property. That Dickinson evaluated the property at less than the Teccas' estimation does not relieve him of noting this considerable discrepancy. Dickinson's agent was authorized to spend up to $ 450,000 at the sale, yet he spent only $ 130,000. [13] Like the purchaser in *Meibach*, Dickinson was aware that he was paying only a fraction of the property's value. Thus, the low price was another factor that should have raised Dickinson's suspicions [***26] as a prudent investor.

12    Albice/Teccas' expert witness, a certified general appraiser in Washington State, testified that the property was worth $ 950,000 in February 2007. Karen Tecca stated in her declaration that the property had a value in excess of $ 750,000. Her estimate was based on a 2003 appraisal of the property at $ 607,000, assuming that it had substantially appreciated. In their brief, the Dickinsons argue that fair market value of the property was approximately $ 428,000. Based on this record, the purchase price was between 13-18 percent of its fair market value. In considering the bona fide purchaser issue, the disparity between what Dickinson paid and the true value of the property strongly supports our conclusion that Dickinson should have further investigated the sale. *See RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES § 8.3 cmt. b* (1997) (a court is generally warranted in invalidating a sale where the price is less than 20 percent of fair market value).
13    And $ 450,000 was probably already a significant underestimation of the property's fair market value. Purchasers reasonably anticipate lower prices at a foreclosure sale because properties sold at a foreclosure auction [***27] are "simply worth less." *BFP, 511 U.S. at 539* (emphasis omitted).

¶36 Together, these facts created a duty on Dickinson's part to inquire into the legitimacy of the sale. A reasonably prudent real estate investor concerned with protecting his assets would have inquired into the particulars of the Teccas' default, especially with the knowledge that they had no intention of relinquishing their property. The long delay should have further alerted him that the Teccas were likely [*932] trying to cure the default on their loan and prevent a foreclosure. When Dickinson contacted the trustee to confirm the date of the sale, he could have easily also confirmed the circumstances of the default. As in *Meibach, 102 Wn.2d at 177*,

Dickinson's conduct does not match that of an ordinary prudent investor.

¶37 Once on inquiry notice, it is clear that Dickinson would have discovered serious defects in the foreclosure sale process. With reasonably diligent inquiry, he could have learned that the six continuances were a result of the Teccas' payments under a forbearance agreement and that they attempted to cure their default more than 11 days prior to the actual sale date. Accordingly, we hold that Dickinson is not a [***28] bona fide purchaser protected under *RCW 61.24.040(7)*. Rather, he is bound by Albice/Teccas' uncontroverted evidence that the sale was conducted in violation of the Act.

III. SALE VOID ON EQUITABLE GROUNDS

¶38 In addition, Albice/Teccas argue that the substantially inadequate sale price, in conjunction with unfair circumstances surrounding the sale, establishes equitable grounds to set aside the foreclosure sale.

¶39 Washington courts have not set a benchmark for when a foreclosure sale price is inadequate as a matter of law. In general, Washington courts have found the purchase price inadequate when it is less than 10 percent of the fair market value. *See, e.g., Miebach, 102 Wn.2d at 177-79* (sale for less than 2 percent of the fair market value was a grossly inadequate sales price); *Cox, 103 Wn.2d at 387-88* (purchase price between 3.9 and 5.9 percent of the fair market value was grossly inadequate); *Casa del Rey, 110 Wn.2d at 72* (purchase for 4.9 percent of the fair market value was inadequate). The *Restatement (Third) of Property* states that a court is generally warranted in invalidating a sale where the price is less than 20 percent of fair market value. *RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES § 8.3 cmt. b* [***29] [*933] (1997). As noted above, Dickinson purchased the property for between 13 and 18 percent of its fair market value.

[24, 25] ¶40 Inadequacy of price alone, however, is generally insufficient to set aside a nonjudicial foreclosure sale. *Udall, 159 Wn.2d at 914-15*. But a grossly inadequate purchase price together with circumstances of other unfair procedures may provide equitable grounds to set aside a sale. *Udall, 159 Wn.2d at 914*. Where violations of a sale are technical, a borrower must show that the [**1159] circumstances surrounding the sale unfairly harmed or prejudiced the borrower. *Steward, 51 Wn. App. at 515*.

[26] ¶41 According to Albice/Teccas, the string of continuances chilled the bidding process, contributing to the substantially low sale price. At the initial sale, four or five bidders appeared; only two bidders appeared at the actual sale 161 days later. The crier of the sale commented that the sale was continued so many times that

Case 3:12-cv-05778-RBL   Document 5   Filed 08/29/12   Page 88 of 100

Page 11

157 Wn. App. 912, *; 239 P.3d 1148, **;
2010 Wash. App. LEXIS 2199, ***

nobody thought it was going to happen. And the actual sale, originally scheduled for 10:00 AM, was not held until 11:45 AM. A trustee's actions that effectively suppress competitive bidding need not be intentional to warrant relief. *See Country Express Stores, Inc. v. Sims, 87 Wn. App. 741, 748-49, 943 P.2d 374 (1997).* [***30] Here, the trustee's continuances and delayed start of the actual bidding likely chilled the bidding process by reducing the number of potential bidders. [14] Dickinson paid only a fraction of the amount he was prepared to pay, suggesting he would have paid more had the bidding been competitive.

> 14  To set aside a sale on the grounds of chilled bidding, the challenger to a sale must establish that bidding was actually suppressed with affirmative, factual evidence. *Country Express Stores, 87 Wn. App. at 749.* Albice/Teccas do not argue that the sale should be set aside on these grounds alone; rather, the chilled bidding is an additional unfair circumstance in support of setting aside the sale on the grounds of inadequate price. In this case, they need not prove actual suppression.

[27]  ¶42 More importantly, circumstances surrounding the default and the Teccas' attempts to save their substantial equity in the property constitute unfair circumstances warranting the setting aside of the sale on equitable [*934] grounds. In *Cox, 103 Wn.2d at 386,* the trustee conducted the sale even though he had actual notice of a pending action where the borrowers were challenging their underlying debt obligation. The court reasoned [***31] that given his fiduciary duties to both the borrower and the lender, the trustee should have informed the borrower's attorney that she had failed to properly restrain the sale until resolution of the underlying dispute. *Cox, 103 Wn.2d at 390.* The court held that the trustee's action, along with the inadequate purchase price, resulted in grounds to set aside the sale. *Cox, 103 Wn.2d at 388.*

¶43 Here, the Teccas tendered the final payment under the forbearance agreement on February 2, 2007, more than 11 days before the sale on February 16, 2007. Although this amount may not have been sufficient to automatically discontinue the sale under *RCW 61.24.090(3),* [15] it was sufficient to require that Premier, as a fiduciary to both the lender and Albice/Teccas, cancel the sale, give the Teccas notice of any additional costs due, and reschedule the sale with additional public notices. [16] The harm to the lender would be minimal in again delaying the sale. The harm to Albice/Teccas in proceeding with the sale was enormous--the loss of $300,000-$800,000 of equity in the property. A trustee is not required to obtain the best possible price for the trust property; nonetheless, a trustee must take reasonable [***32] and appropriate steps to avoid sacrificing the debtor's interest in the property. *Cox, 103 Wn.2d at 389.* Here, the trustee acted with complete disregard for the Albice/Teccas' [*935] substantial interest in the property. We have no hesitation in holding that under *Cox,* these circumstances more than warrant setting aside the nonjudicial foreclosure sale. We vacate the trial court's order approving the sale and remand for the [**1160] trial court to enter an order declaring the sale void.

> 15  In addition to paying the default amount, the Teccas also needed to pay the expenses and costs incurred by the trustee. *RCW 61.24.090(1)(b).*
>
> 16  Under the forbearance agreement, the Teccas contracted to pay Option One. But it would be disingenuous to suggest that payment to Option One did not put Premier on notice of the Teccas' attempt to cure the default. As noted above, Premier and Option One are closely affiliated, sharing access to the same loan information, including foreclosure payments. Lisa Clary, an Option One employee designated as Premier's representative in this action, stated that she knew the Teccas' final payment under the agreement was tendered late and rejected. Moreover, the signatory of the deed of [***33] trust, Kim Thorne, was employed by Option One. Thus, Premier was on notice, either actual or constructive, that the Teccas tendered their final payment under the forbearance agreement.

### IV. ATTORNEY FEES

¶44 Finally, Albice/Teccas argue that if we find that the trustee's sale was void, the judgment entered for rent, costs, and statutory attorney fees should be reversed. *RCW 59.12.170* provides that the court shall assess damages occasioned by an unlawful detainer. Costs, including statutory attorney fees, are awarded to a prevailing party pursuant to *RCW 4.84.010.* Because we have set aside the sale as void, we also reverse the trial court's judgments for rent, costs, and statutory attorney fees in favor of Dickinson. We award costs and fees to Albice/Teccas as the prevailing party. *RCW 4.84.010.*

¶45 We reverse.

PENOYAR, C.J., and WORSWICK, J., concur.

Review granted at *170 Wn.2d 1029 (2011).*

Annotated Revised Code of Washington by LexisNexis



1 of 6 DOCUMENTS

CHRISTA L. ALBICE, ET AL., *Respondents*, v. PREMIER MORTGAGE SERVICES OF WASHINGTON, INC., ET AL., *Defendants*, RON DICKINSON ET AL., *Petitioners*.

No. 85260-0

SUPREME COURT OF WASHINGTON

*174 Wn.2d 560; 276 P.3d 1277; 2012 Wash. LEXIS 378*

September 22, 2011, Argued
May 24, 2012, Filed

**PRIOR HISTORY:** Appeal from Mason County Superior Court. 07-2-00172-1. Honorable Toni A. Sheldon.
*Albice v. Premier Mortgage Servs. of Wash., Inc., 157 Wn. App. 912, 239 P.3d 1148, 2010 Wash. App. LEXIS 2199 (2010)*

**SUMMARY:**

WASHINGTON OFFICIAL REPORTS SUMMARY

**Nature of Action:** In separate actions, the purchaser of property at a trustee's sale in foreclosure of a deed of trust sought relief on a claim of unlawful detainer against the grantors of the deed and to quiet title to the property and the grantors sought to set aside the trustee's sale and to quiet title to the property.

**Superior Court:** After consolidating the actions, and after ruling by summary judgment that the purchaser held the property as a bona fide purchaser, the Superior Court for Mason County, No. 07-2-00172-1, Toni A. Sheldon, J., on April 4, 2009, entered a judgment in favor of the purchaser, quieting title to the property and awarding damages and costs.

**Court of Appeals:** The court *reversed* the judgment at *157 Wn. App. 912 (2010)*, holding that the sale did not comply with statutory requirements, that the purchaser was not a bona fide purchaser, that the trustee's deed failed to state facts that would protect a buyer, that the sale price was inadequate, and that the sale was surrounded by other unfair circumstances.

**Supreme Court:** Holding that the trustee's sale was void because the nonjudicial foreclosure proceedings were marred by repeated statutory noncompliance, that equity cannot support waiver given the many procedural defects and, and that the purchaser did not qualify as a bona fide purchaser, the court *affirms* the decision of the Court of Appeals and *remands* the case to the trial court for the entry of a judgment declaring the trustee's sale invalid and quieting title in the grantors as against the purchaser at the trustee's sale.

**HEADNOTES**

WASHINGTON OFFICIAL REPORTS HEADNOTES

**[1] Deeds of Trust -- Nonjudicial Foreclosure -- Statutory Provisions -- Purposes of Act.** The deeds of trust act (ch. 61.24 RCW) furthers three goals: (1) to keep the nonjudicial foreclosure process efficient and inexpensive, (2) to provide an adequate opportunity for interested parties to prevent wrongful foreclosures, and (3) to promote the stability of land titles.

**[2] Deeds of Trust -- Nonjudicial Foreclosure -- Statutory Provisions -- Compliance -- Strict Compliance.** Because the deeds of trust act (ch. 61.24 RCW) dispenses with many protections enjoyed by borrowers under judicial foreclosures, lenders must strictly comply with its provisions.

**[3] Deeds of Trust -- Nonjudicial Foreclosure -- Statutory Provisions -- Construction -- Strict Construction.** Because the deeds of trust act (ch. 61.24 RCW) dispenses with many protections enjoyed by borrowers under judicial foreclosures, courts must strictly construe its provisions in favor of borrowers.

174 Wn.2d 560, *; 276 P.3d 1277, **;
2012 Wash. LEXIS 378, ***

**[4] Limitation of Actions -- Statutory Provisions -- Effect -- In General.** When a party's authority to act is prescribed by a statute and the statute includes a time limit, the party's failure to act within the specified time divests the party of statutory authority. Without statutory authority, the party's action is invalid.

**[5] Limitation of Actions -- Deeds of Trust -- Nonjudicial Foreclosure -- Trustee's Sale -- Continuance -- Limitation Period.** Under *RCW 61.24.040(6)*, a trustee's sale of property in foreclosure of a deed of trust may not be continued beyond 120 days after the date the sale was originally scheduled. After 120 days have elapsed since the sale was originally scheduled, the trustee's right to conduct the original sale is extinguished and a sale occurring after that date is void.

**[6] Waiver -- Legal Rights -- In General.** Waiver is an equitable principle that can apply to defeat someone's legal rights when the facts support an argument that the party relinquished its rights by delaying in asserting or failing to assert an otherwise available adequate remedy.

**[7] Deeds of Trust -- Nonjudicial Foreclosure -- Defect -- Waiver -- Statutory Provisions -- Applicability.** For purposes of *RCW 61.24.040(1)(f)(IX)*, which provides that "[f]ailure to bring ... a lawsuit may result in waiver of any proper grounds for invalidating the Trustee's sale [in foreclosure of a deed of trust]," the word "may" indicates the legislature neither requires nor intends for courts to strictly apply waiver. Under the statute, a court may apply waiver where it is equitable under the circumstances and where it serves the goals of the act.

**[8] Deeds of Trust -- Nonjudicial Foreclosure -- Defect -- Waiver -- Failure To Pursue Presale Remedies.** A grantor of a deed of trust does not waive the right to raise a postsale challenge to the validity of a trustee's sale in foreclosure of the deed of trust by failing to pursue presale remedies if the grantor did not have grounds to challenge the underlying debt at the time of receiving notice of the sale, did not have knowledge of the alleged breach in time to restrain the sale, and had a reasonable expectation under the circumstances that the sale would be canceled.

**[9] Deeds of Trust -- Nonjudicial Foreclosure -- Defect -- Judicial Consideration -- In General.** In order to ensure that trustees of deeds of trust strictly comply with the requirements of the deeds of trust act (ch. 61.24 RCW) before selling property in nonjudicial foreclosure proceedings, the courts must be able to review postsale challenges when such challenges are promptly asserted, and provided there was no waiver.

**[10] Deeds of Trust -- Nonjudicial Foreclosure -- Bona Fide Purchaser -- Who Qualifies -- In General.** A bona fide purchaser at a trustee's sale in foreclosure of a deed of trust is one who purchases the property without actual or constructive knowledge of another's claim of right to or equity in the property and who pays valuable consideration, but if the purchaser has knowledge or information that would cause an ordinarily prudent person to inquire further, and if such inquiry, reasonably diligently pursued, would lead to discovery of title defects or of equitable rights of others regarding the property, then the purchaser has constructive knowledge of everything the inquiry would have revealed. Thus, in considering whether a person is a bona fide purchaser, a court asks (1) whether the surrounding events created a duty of inquiry and, if so, (2) whether the purchaser satisfied that duty.

**[11] Deeds of Trust -- Nonjudicial Foreclosure -- Bona Fide Purchaser -- Who Qualifies -- Factors -- Real Estate Investment Experience.** In determining whether a purchaser of property at a trustee's sale in foreclosure of a deed of trust qualifies as a bona fide purchaser, a court considers the purchaser's knowledge and experience with real estate.

**[12] Deeds of Trust -- Nonjudicial Foreclosure -- Bona Fide Purchaser -- Who Qualifies -- Factors -- Experience or Familiarity With Foreclosure Process.** In determining whether a purchaser of property at a trustee's sale in foreclosure of a deed of trust qualifies as a bona fide purchaser, a court considers the purchaser's experience or familiarity with nonjudicial foreclosure sales. C. JOHNSON, J., delivered the opinion of the court, in which MADSEN, C.J.; CHAMBERS, OWENS, J.M. JOHNSON, and WIGGINS, JJ.; and ALEXANDER, J. PRO TEM., concurred. STEPHENS, J., filed a concurring opinion, in which FAIRHURST, J., concurred. GONZÁLEZ, J., did not participate in the disposition of this case.

**COUNSEL:** *Emmelyn Hart* and *Philip A. Talmadge* (of Talmadge/Fitzpatrick) and *Richard L. Ditlevson* (of Dixon Rodgers Kee & Pearson PS), for petitioners.

*Douglas N. Kiger* and *Jonathan W. Blado* (of Blado Kiger Bolan PS), for respondents.

**JUDGES:** [***1] AUTHOR: Justice Charles W. Johnson. WE CONCUR: Chief Justice Barbara A. Madsen, Justice Tom Chambers, Justice Susan Owens, Justice James M. Johnson, Justice Charles K. Wiggins, Gerry L. Alexander, Justice Pro Tem. AUTHOR: Justice Debra L. Stephens. WE CONCUR: Justice Mary E. Fairhurst.

174 Wn.2d 560, *; 276 P.3d 1277, **;
2012 Wash. LEXIS 378, ***

**OPINION BY:** Charles W. Johnson

**OPINION**

En Banc

[**1279] [*563] ¶1 C. JOHNSON, J. -- This case involves interpretation of the deeds of trust act, chapter 61.24 RCW, and the statutory procedural requirements for nonjudicially foreclosing on an owner's interest. This case also involves whether, under the facts here, the property owner waived the right to challenge the sale and whether the purchaser of the nonjudicial foreclosure sale statutorily qualifies as a bona fide purchaser (BFP).

¶2 The trial court ruled that despite procedural non-compliance, the purchaser was a BFP under the statute and quieted title in the purchaser. The Court of Appeals reversed, holding that failure to comply with the statutory requirements was reason to set the sale aside and that factually, the purchaser did not qualify as a BFP. We affirm the Court of Appeals.

FACTS

¶3 Christa Albice and Karen Tecca (hereinafter Tecca) inherited the property at issue here. In 2003, Tecca [***2] borrowed $ 115,500 against the property. Clerk's Papers (CP) at 305. The property was appraised at $ 607,000 in 2003 (CP at 1038) and at $ 950,000 in 2007. CP at 394. The loan was [*564] serviced by Option One Mortgage Corporation (Option One), and Premier Mortgage Services of Washington (Premier) acted as the trustee. Option One and Premier shared databases, having access to the same loan information, and everyone who worked for Premier was an employee of Option One.

¶4 In 2006, Tecca defaulted on the loan and received a notice of trustee's sale, setting the foreclosure sale for September 8, 2006. CP at 460. Tecca then, in July 2006, negotiated and entered into a forbearance agreement to cure the default. The total reinstatement amount was for $ 5,126.97, which included $ 1,733.79 for estimated foreclosure fees and costs. CP at 471. Under the agreement, payments were due the 16th of each month, ending January 16, 2007. CP at 472. Although Tecca tendered each payment late, Option One accepted each payment, except for the last. The last payment was sent on February 2, 2007, but was rejected by Option One. During a deposition, Premier's [**1280] representative, an Option One employee, testified that the [***3] last late payment was the only breach of the "Forbearance Agreement." CP at 259. Tecca learned the final payment was rejected on February 10, 2007, and the payment was refunded on February 16, 2007. Although the Forbearance Agreement provided that upon breach, a 10-day

written notice would be sent, Tecca never received this notice. CP at 468, 454.

¶5 The trustee's sale originally set for September 8, 2006 was continued six times. Each continuance was tied to the payments Tecca made under the Forbearance Agreement. The foreclosure sale took place on February 16, 2007. CP at 352-59. Through an agent, the petitioner, Ron Dickinson, successfully bid $ 130,000 for the property. [1]

> 1   Although four or five bidders showed up at the original sale date, only two bidders, one being Dickinson's agent, appeared at the February 16 sale. CP at 360, 426.

¶6 Dickinson has purchased about 9 of his 13 properties at nonjudicial foreclosure sales. CP at 418-19. Dickinson [*565] buys and sells houses as a business. He has familiarized himself with foreclosure law to some extent to keep himself out of "trouble." CP at 428. When Dickinson learned that the Tecca property was for sale, he researched the property and obtained [***4] a copy of the notice of trustee's sale, which listed the amount in arrears as $ 1,228.03. CP at 526, 530. About a week before the originally scheduled sale, Dickinson visited Karen Tecca's home and offered to buy the property. She refused and told him the sale would not happen. CP at 421. Dickinson attended the first scheduled sale, kept track of postponements, and phoned Premier to determine the next sale date. He was surprised when the property did finally come up for sale.

¶7 Tecca first learned the property was sold when Dickinson told Tecca they no longer owned it and needed to leave. Dickinson then filed an unlawful detainer action and sought to quiet title. Tecca countersued, seeking to quiet title in an action to set aside the nonjudicial sale. Tecca also brought suit against Option One and Premier, but the trial court dismissed the action based on an arbitration clause. Tecca's and Dickinson's actions were consolidated. Dickinson cross claimed against Option One and Premier, but he voluntarily dismissed those claims.

¶8 Dickinson moved for summary judgment to establish that he was a BFP and entitled to quiet title. Tecca also moved for summary judgment, arguing the foreclosure sale [***5] should be set aside because the sale occurred after the statutory deadline and Premier was not a qualified trustee with authority to conduct the sale. The trial court granted Dickinson's motion, ruling that Dickinson was a BFP and, despite procedural noncompliance by the trustee, the recitations in the trustee's deed were conclusive evidence of statutory compliance in favor of BFPs. The issue of whether Premier was a qualified trustee was left for trial. Following trial, the

Case 3:12-cv-05778-RBL   Document 5   Filed 08/29/12   Page 92 of 100

Page 4

174 Wn.2d 560, *; 276 P.3d 1277, **;
2012 Wash. LEXIS 378, ***

court concluded Premier was authorized to act as [*566] the trustee, [2] quieted title in Dickinson, and awarded Dickinson damages.

> 2   The trial court concluded Premier had statutory authority to act as a trustee under *RCW 61.24.010*, determining Premier was qualified based on its internal records rather than annual reports filed with the Secretary of State. We do not reach this issue.

¶9 Tecca appealed. The Court of Appeals reversed, setting the sale aside. It reversed the trial court's award of damages and instead awarded Tecca costs and fees as the prevailing party under *RCW 4.84.010*. *Albice v. Premier Mortg. Servs. of Wash., Inc.*, 157 Wn. App. 912, 923-25, 928, 935, 239 P.3d 1148 (2010).

¶10 Dickinson petitioned for review. We granted [***6] review. *Albice v. Premier Mortg. Servs. of Wash., Inc.*, 170 Wn.2d 1029, 249 P.3d 623 (2011).

### ISSUES

¶11 1. Whether a trustee's sale taking place beyond the 120 days permitted by *RCW 61.24.040(6)* warrants invalidating the sale.

[**1281] ¶12 2. Whether, under the circumstances of this case, a borrower waives the right to bring a post-sale challenge for failing to utilize the presale remedies under *RCW 61.24.130*.

¶13 3. Whether a bona fide purchaser can prevail despite an otherwise invalid sale.

### ANALYSIS

¶14 This case raises questions of law and statutory interpretation on appeal from summary judgment. Our review is de novo. *Lamtec Corp. v. Dep't of Revenue*, 170 Wn.2d 838, 842, 246 P.3d 788 (2011) (citing *Dreiling v. Jain*, 151 Wn.2d 900, 908, 93 P.3d 861 (2004)).

[*567] [1-3] ¶15 The deeds of trust act, chapter 61.24 RCW, [3] creates a three-party mortgage system allowing lenders, when payment default occurs, to nonjudicially foreclose by trustee's sale. The act furthers three goals: (1) that the nonjudicial foreclosure process should be efficient and inexpensive, (2) that the process should result in interested parties having an adequate opportunity to prevent wrongful foreclosure, and (3) that the process should promote stability of [***7] land titles. *Cox v. Helenius*, 103 Wn.2d 383, 387, 693 P.2d 683 (1985). Because the act dispenses with many protections commonly enjoyed by borrowers under judicial foreclosures, lenders must strictly comply with the statutes and courts must strictly construe the statutes in the borrower's favor. *Udall v. T.D. Escrow Servs., Inc.*, 159 Wn.2d 903,

915-16, 154 P.3d 882 (2007); *Koegel v. Prudential Mut. Sav. Bank*, 51 Wn. App. 108, 111-12, 752 P.2d 385 (1988). The procedural requirements for conducting a trustee sale are extensively spelled out in *RCW 61.24.030* and *RCW 61.24.040*. Procedural irregularities, such as those divesting a trustee of its statutory authority to sell the property, can invalidate the sale. *Udall*, 159 Wn.2d at 911.

> 3   This chapter was revised in 2009 and 2012. No changes affect any of the statutes at issue here; thus, the current version is cited.

#### 1. Procedural Irregularities

[4, 5] ¶16 Throughout the proceedings, Tecca has argued that the trustee's failure to comply with certain statutory requirements renders the sale invalid. These procedural irregularities or defects include that Premier had no authority to conduct the sale 161 days after the original sale date under *RCW 61.24.040(6)*, [***8] that Premier violated *RCW 61.24.090(1)* by failing to discontinue the sale after they cured default more than 11 days before the actual sale date, and that the recitals contained in the trustee's deed were inadequate under *RCW 61.24.040(7)*. Regarding the recitals, the Court of Appeals agreed with Tecca, concluding that because the deed of trust failed to recite *any facts* triggering [*568] the protections of *RCW 61.24.040(7)*, Dickinson was not protected from the undisputed defects in the sale. The Court of Appeals then set the sale aside based on its conclusion that Premier had no statutory authority to sell the property when it continued the sale past the 120 days permitted by the act. We agree with the Court of Appeals' holding that Premier lost statutory authority after it continued the sale past 120 days from the original sale date and that the sale was invalid. We need not address or resolve any further issues regarding other procedural irregularities.

¶17 *RCW 61.24.040(1)(f)* and (2) provide the requirements for a deed of trust foreclosure, including the notice requirements for the trustee's sale and foreclosure. Under *RCW 61.24.040(6)*, a trustee may continue a sale "for any cause the trustee [***9] deems advantageous ... for a period or periods *not exceeding a total of one hundred twenty days*." (Emphasis added.) A plain reading of this provision permits a trustee to continue a sale once or more than once but unambiguously limits the trustee from continuing the sale past 120 days.

¶18 When a party's authority to act is prescribed by a statute and the statute [**1282] includes time limits, as under *RCW 61.24.040(6)*, failure to act within that time violates the statute and divests the party of statutory authority. Without statutory authority, any action taken is invalid. As we have already mentioned and held, under

Case 3:12-cv-05778-RBL   Document 5   Filed 08/29/12   Page 93 of 100

Page 5

174 Wn.2d 560, *; 276 P.3d 1277, **;
2012 Wash. LEXIS 378, ***

this statute, strict compliance is required. *Udall, 159 Wn.2d at 915-16.* Therefore, strictly applying the statute as required, we agree with the Court of Appeals and hold that under *RCW 61.24.040(6)*, a trustee is not authorized, at least not without reissuing the statutory notices, to conduct a sale after 120 days from the original sale date, and such a sale is invalid.

¶19 Here, Premier issued the notice of trustee's sale listing the sale date as September 8, 2006. Premier held the actual sale on February 16, 2007, 161 days from the original sale date in violation of the statute and divesting [***10] its statutory authority to sell. The sale was invalid.

[*569]  *2. Waiver*

[6] ¶20 Though undisputed that Premier failed to strictly comply with its statutory obligations, Dickinson nevertheless contends Tecca waived their right to bring a postsale challenge by failing to pursue the presale remedies provided for in *RCW 61.24.040(1)(f)(IX).* Waiver is an equitable principle that can apply to defeat someone's legal rights where the facts support an argument that the party relinquished their rights by delaying in asserting or failing to assert an otherwise available adequate remedy. Dickinson urges us to find waiver, contending that at any time after Tecca received notice of their presale rights and before the actual sale, they could have restrained the sale and litigated the issue of the alleged breach of the Forbearance Agreement and underlying debt. He argues that because Tecca failed to use their presale remedies, their postsale challenge is barred. We disagree.

¶21 We have found waiver in a foreclosure setting where the facts support its application. In *Plein*, we established that waiver of any postsale challenge occurs where a party (1) received notice of the right to enjoin the sale, (2) had actual or constructive [***11] knowledge of a defense to foreclosure prior to the sale, and (3) failed to bring an action to obtain a court order enjoining the sale. *Plein v. Lackey, 149 Wn.2d 214, 227, 67 P.3d 1061 (2003)* (quoting *Cox, 103 Wn.2d at 388*). In that case, the borrower received the notices of foreclosure and trustee's sale, notifying him of his presale right to seek a restraining order. Almost two months before the scheduled sale, the borrower sought a permanent injunction barring the trustee's sale on grounds that there was no default on the underlying debt. In addition, the parties were involved in a lawsuit disputing corporate dealings and other actions. The borrower failed to seek a temporary injunction, which would have halted the sale pending a hearing on the merits of the permanent injunction. As a result, the sale proceeded *as scheduled*, on the date listed in the notices, and  [*570]  the property was sold before the hearing. *Plein, 149 Wn.2d at 220-21.* Under these circumstances, in finding waiver, we recognized

that allowing the borrower to delay asserting a defense until after the sale would have defeated the spirit and intent of the act. [4] *Plein, 149 Wn.2d at 228* (quoting *Peoples Nat'l Bank of Wash. v. Ostrander, 6 Wn. App. 28, 32, 491 P.2d 1058 (1971)).* [***12] Given that the borrower had adequate opportunity  [**1283]  to utilize his presale remedies to prevent wrongful foreclosure, we explained that finding waiver under those circumstances furthered the goals of the act. *Plein, 149 Wn.2d at 228.*

> 4    Similarly, the Court of Appeals has found waiver in cases where the challenging party failed to seek a temporary restraining order even though they knew of proper grounds for such an order well in advance of the sale. *See, e.g., Peoples Nat'l Bank of Wash. v. Ostrander, 6 Wn. App. 28, 32, 491 P.2d 1058 (1971)* (defendants were barred from asserting a postsale challenge when defendants chose to wait until after the sale, about five months after discovery of the alleged fraud, to assert their claimed defense); *Koegel, 51 Wn. App. at 116* (borrower waived right to contest the sale because as early as a month prior to the sale, the borrower, more than once, threatened to enjoin the sale, and the borrower's attorney attended the sale but made no continuance request or objection); *Country Express Stores, Inc. v. Sims, 87 Wn. App. 741, 744, 752, 943 P.2d 374 (1997).*

[7] ¶22 Waiver, however, cannot apply to all circumstances or types of postsale challenges. *RCW 61.24.040(1)(f)(IX)* [***13] provides that "[f]ailure to bring ... a lawsuit *may* result in waiver of any proper grounds for invalidating the Trustee's sale." (Emphasis added.) The word "may" indicates the legislature neither requires nor intends for courts to strictly apply waiver. Under the statute, we apply waiver only where it is equitable under the circumstances and where it serves the goals of the act. Unlike judicial foreclosures, trustee foreclosure sales are conducted with little to no oversight. Still, once a property is sold, the act favors purchasers over property owners and other borrowers by giving preference to the third goal--stability of land titles. It does so by creating, at minimum, a rebuttable presumption that the sale was conducted in compliance [*571] with the procedural requirements of the act. [5] Thus, in determining whether waiver applies, the second goal--that the nonjudicial foreclosure process should result in is interested parties having an adequate opportunity to prevent wrongful foreclosure--becomes particularly important.

> 5    *RCW 61.24.040(7)* provides that the deed's recital of statutory compliance constitutes "prima facie evidence of such compliance and conclusive

Case 3:12-cv-05778-RBL   Document 5   Filed 08/29/12   Page 94 of 100

Page 6

174 Wn.2d 560, *; 276 P.3d 1277, **;
2012 Wash. LEXIS 378, ***

evidence thereof in favor [***14] of bona fide purchasers and encumbrancers for value."

**[8]** ¶23 Under the facts of this case, we conclude waiver cannot be equitably established. Dickinson seemingly argues that Tecca's presale remedies were triggered the moment they received notice of the trustee's sale. Yet this argument assumes the borrower can challenge the underlying debt. Although this was correct in *Plein*, because the borrower believed the debt had been paid, here, when Tecca received the notice, they had no grounds to challenge the underlying debt. In fact, by entering into the Forbearance Agreement, they were acknowledging default on their loan payment. This postponed the foreclosure sale, and tendering each monthly payment gave them additional time to cure the default. While making these payments, Tecca had no reason to seek an order restraining a sale that may not even proceed. [6]

> 6 Unlike in *Plein*, where the sale proceeded as scheduled on the date in the notices, the sale here was continued six times.

¶24 Further, unlike in *Plein*, where the borrower had a defense almost two months prior to the sale, here, Tecca had no knowledge of their alleged breach in time to restrain the sale. Tecca tendered all payments, albeit late, [***15] under the Forbearance Agreement. Option One accepted all of those late payments and permitted Premier to continue the sale each time, except for the last. By repeatedly accepting the prior late payments, Option One created expectancy in Tecca that their last late payment would also be accepted. Tecca could not have known Option One would consider their last late payment a breach of the agreement, having [*572] never done so before. They reasonably believed their last payment cured the default. While the Forbearance Agreement stated they would receive a 10-day written notice upon breach, Tecca never received this notice. [7] They rightly assumed the sale would be canceled after they tendered their last payment. [8] And after learning their property had been sold, Tecca promptly brought their [**1284] countersuit, showing no intention of "sleeping on" their rights.

> 7 Dickinson argues that Option One notified Tecca of the breach by sending a letter on January 31, 2007. Karen Tecca, however, testified at her deposition that she did not receive the purported letter, and while Option One produced an internal electronic copy of the letter, it produced no proof of service. We view the facts in the light most favorable [***16] to Tecca as the non-moving party on summary judgment.

8 As Tecca contends, Premier was required to discontinue the sale under *RCW 61.24.090(1)* as they submitted final payment curing the default more than 11 days prior to the actual sale date. Although under the Forbearance Agreement Tecca tendered payments to Option One, as the Court of Appeals noted, *Albice, 157 Wn. App. at 934 n.16*, it would be disingenuous to suggest Premier had no notice of Tecca's final payment. Option One and Premier were closely affiliated, if not the same company. The two companies shared databases, that is, had access to the same loan information, and everyone who worked for Premier was an employee of Option One.

**[9]** ¶25 Additionally, and equally important, to ensure trustees strictly comply with the requirements of the act, courts must be able to review postsale challenges where, like here, the claims are promptly asserted. Although Dickinson contends this defeats the third goal, the goal is to *promote* the stability of land titles. *Cox, 103 Wn.2d at 387*. Enforcing statutory compliance encourages trustees to conduct procedurally sound sales. When trustees strictly comply with their legal obligations under the act, interested [***17] parties will have no claim for postsale relief, thereby promoting stable land titles overall. Under the facts here, we hold that Tecca did not waive their rights.

### 3. Bona Fide Purchaser

¶26 Despite the trustee's failure to strictly comply with the statutory requirements and in addition to the waiver argument, Dickinson contends he is a BFP and should [*573] receive title. While the trial court concluded that Dickinson was a BFP, the Court of Appeals disagreed. We agree with the Court of Appeals.

**[10-12]** ¶27 Under *RCW 61.24.040(7)*, the deed's "recital shall be prima facie evidence of [statutory] compliance and conclusive evidence thereof in favor of bona fide purchasers." [9] Whether Dickinson was a BFP is a factual and legal inquiry. A BFP is one who purchases property without actual or constructive knowledge of another's claim of right to, or equity in, the property, and who pays valuable consideration. But if the purchaser has knowledge or information that would cause an ordinarily prudent person to inquire further, and if such inquiry, reasonably diligently pursued, would lead to discovery of title defects or of equitable rights of others regarding the property, then the purchaser has constructive knowledge [***18] of everything the inquiry would have revealed. Thus, in considering whether a person is a BFP, we ask (1) whether the surrounding events created a duty of inquiry and, if so, (2) whether the purchaser satisfied that duty. In this determination, we consider the purchaser's knowledge and experience

Page 7

174 Wn.2d 560, *; 276 P.3d 1277, **;
2012 Wash. LEXIS 378, ***

with real estate. *Miebach v. Colasurdo, 102 Wn.2d 170, 175-76, 685 P.2d 1074 (1984).*

9   As mentioned, Tecca also contends that the recitals in the deed were inadequate to demonstrate compliance with the statute and cannot protect Dickinson even if he were a BFP. The act requires the deed to "recite *the facts* showing that the sale was conducted in compliance with all of the requirements of this chapter and of the deed of trust." *RCW 61.24.040(7)* (emphasis added). Here, the deed contained conclusory language, stating, "All legal requirements and all provisions of said Deed of Trust have been complied with, as to acts to be performed and notices to be given, as provided in Chapter 61.24 RCW." CP at 824. Although Dickinson argues that the recitals in the deed are almost identical to the form deed in 4 Washington State Bar Association, *Washington Real Property Deskbook* § 47.11(16) (3d ed. Supp. 2001), [***19] the party drafting the deed, or any legal document, must still consult the law to ensure compliance. The statute requires the deed to recite "facts" showing statutory compliance. Not only did the deed contain conclusory language stating compliance, the deed also misleadingly listed the sale date in the notice of trustee's sale as February 16, 2007, instead of the original sale date of September 8, 2006. It also incorrectly states that the default was not cured, that is, that final payment was not tendered, 11 days prior to the date of the trustee's sale. It is questionable whether the recitals in the deed satisfied the statute.

[*574] ¶28 The facts pertaining to Dickinson's status are undisputed. We give, as did the Court of Appeals, substantial weight to Dickinson's real estate experience. Dickinson has extensive experience with nonjudicial foreclosure sales, purchasing 9 of his 13 properties at such sales. He familiarized himself with foreclosure law and knew enough about the process to obtain the notice of trustee's sale from a title company.

¶29 Dickinson had within his knowledge sufficient facts to put an experienced real estate purchaser, such as himself, on inquiry notice. He had a copy of the [***20] notice of trustee's sale, which listed the amount in arrears [**1285] as only $ 1,228.03, suggesting Tecca had substantial equity in the property. CP at 530. Dickinson contacted Tecca, who refused to sell him the property and insisted the sale would not happen. Dickinson kept track of the numerous continuances and was surprised that the property was finally up for sale, five months after the date listed in the notice. The number of continuances, however, chilled the bidding process, contributing to the grossly inadequate purchase price. Although four or five bidders showed up to the original sale, only Dickinson and another bidder showed up at the actual sale. Dickinson was prepared to bid up to $ 450,000 for the property, showing he knew the property was worth at least that much. The substantial equity, coupled with the minor default amount, Tecca's intention to keep the property, and the numerous continuances, created a duty of inquiry, which Dickinson failed to satisfy. Given that he had already contacted Tecca once, Dickinson could have contacted Tecca again to determine whether default had been cured. Had Dickinson made a reasonably diligent inquiry, he could have discovered that the numerous [***21] continuances were tied to payments under the Forbearance Agreement. Because real estate investment was his livelihood, Dickinson should have taken more care with this purchase in order to claim BFP protection. We agree with the Court of Appeals and hold that Dickinson was not a BFP.

[*575]   CONCLUSION

¶30 The nonjudicial foreclosure proceedings here were marred by repeated statutory noncompliance. The financial institution acting as the lender also appeared to be acting as the trustee under a different name; the lender repeatedly accepted late payments and, at its sole discretion, rejected only the final late payment that would have cured the default; and the trustee conducted a sale without statutory authority. Equity cannot support waiver given these procedural defects and the purchaser's status as a sophisticated real estate investor or buyer who had constructive knowledge of the defects in the sale.

¶31 We conclude the trustee sale was invalid. We affirm the Court of Appeals and remand to the trial court to enter an order declaring the sale invalid and quieting title in Tecca as against Dickinson. We also affirm the Court of Appeals' decision reversing the trial court's judgments for rent, costs, [***22] and statutory attorney fees in favor of Dickinson.

MADSEN, C.J.; CHAMBERS, OWENS, J.M. JOHNSON, and WIGGINS, JJ.; and ALEXANDER, J. PRO TEM., concur.

**CONCUR BY:** Debra L. Stephens

**CONCUR**

¶32 STEPHENS, J. (concurring) -- Washington's deed of trust act, chapter 61.24 RCW, reflects a legislative policy choice to create an efficient and inexpensive process for nonjudicial foreclosures. It balances the interests of preventing wrongful foreclosures and promoting the stability of land titles. In reaching for a remedy for the grantors in this case, the majority upsets this balance, broadly allowing postsale challenges to foreclosure

Case 3:12-cv-05778-RBL   Document 5   Filed 08/29/12   Page 96 of 100

Page 8

174 Wn.2d 560, *; 276 P.3d 1277, **;
2012 Wash. LEXIS 378, ***

sales and eroding the presumed validity of a standard-form deed of trust. While this leads to a positive outcome for Bart and Karen Tecca, ultimately it will disserve the public by undermining confidence in the deed of trust system and discouraging its use.

[*576] ¶33 I would resolve this case on narrow equitable grounds and leave the deed of trust system intact. Washington courts recognize that a foreclosure sale may be set aside based on a grossly inadequate sales price coupled with unfair [***23] circumstances or procedural irregularities surrounding the sale. *Udall v. T.D. Escrow Servs., Inc., 159 Wn.2d 903, 914, 154 P.3d 882 (2007).* While there is no firm benchmark for when a sale price is inadequate, courts frequently set aside sales for less than 20 percent of property value, especially when the surrounding circumstances suggest that irregular procedures may have contributed to the low price. *RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES § 8.3 cmt. b (1997)* ("Generally, however, a court is warranted in invalidating a sale where the price [**1286] is less than 20 percent of fair market value ... ."); *Long Lake Lumber Co. v. Stewart, 198 Wash. 348, 352, 88 P.2d 414 (1939)* ("'But where there is a serious inadequacy in the price realized, *the court will seize upon any incident of surprise, undue advantage, irregularity, or other equitable circumstance to grant relief ... .*'" (emphasis added) (quoting 26 RULING CASE LAW § 1294)).

¶34 The low sales price and unfair circumstances in this case provide equitable grounds to invalidate the sale despite the Teccas' failure to seek an injunction before the sale. Like the majority, I find it significant that the string of sale continuances made it difficult [***24] for potential buyers to participate. Four or five bidders appeared at the initial sale, but only Ron Dickinson and one other bidder were present at the eventual sale 161 days later. Dickinson himself had to do a fair amount of legwork to determine if the sale was going to happen. And, he paid far less than he was prepared to pay for the property. For their part, the Teccas tendered the final payment under the forbearance agreement more than 11 days before the sale, supporting their argument that it should have been canceled or rescheduled with additional public notice.

¶35 Moreover, in light of the clear procedural irregularities and the low sale price, Dickinson cannot claim the [*577] status of a bona fide purchaser, though not for all the reasons the majority articulates. [10] "A bona fide purchaser for value is one who without notice of another's claim of right to, or equity in, the property prior to his acquisition of title, has paid the vendor a valuable consideration." *Glaser v. Holdorf, 56 Wn.2d 204, 209, 352 P.2d 212 (1960).* Notice of another's claim can be imputed when the buyer has "such information as would excite apprehension in an ordinary mind and prompt a

person of average prudence [***25] to make inquiry ... ." *Id.* When such a circumstance would put a person of reasonable prudence on inquiry notice, however, that circumstance "is only notice of what a reasonable inquiry would reveal." *Id.* (citing *Paganelli v. Swendsen, 50 Wn.2d 304, 311 P.2d 676 (1957)).* Here, Dickinson obtained the original notice of sale; he therefore had actual notice the sale had been continued for more than 120 days. The procedural irregularities surrounding the sale, combined with the extremely low sale price, would put a person of reasonable prudence on inquiry notice. A reasonable inquiry would have revealed the Teccas' efforts to cure.

10   Given the majority's conclusion that the sale is invalid because it was without statutory authority, majority at 568, it is unclear why the majority goes on to consider whether Dickinson was a bona fide purchaser, majority at 572-73. While the majority does not use the term "void," it essentially concludes the sale was ultra vires and without legal force. But a void deed cannot pass title; only where a transaction is *voidable* (that is, subject to avoidance by the original parties under common law or statutory law) can a bona fide purchaser take good title. *See,* [***26] *e.g.,* *State v. Mermis, 105 Wn. App. 738, 748, & nn.27, 28, 20 P.3d 1044 (2001).* Thus, if the transaction is truly invalid and of no legal effect, as the majority maintains, there is no need to consider whether Dickinson was a bona fide purchaser.

¶36 Accordingly, I would affirm the Court of Appeals based solely on the Teccas' equitable argument arising from these facts. I would not reach beyond these particular circumstances, however. I am concerned that the majority's resolution of this case greatly unsettles reasonable expectations in the arena of nonjudicial foreclosures. In particular, the majority declares that a trustee's violation of timelines in the act renders a foreclosure sale invalid, thereby allowing a grantor to set aside the sale after-the-fact, [*578] notwithstanding the grantor's failure to use the presale remedies under *RCW 61.24.130.* Further, in concluding that Dickinson is not a bona fide purchaser, the majority creates new duties of inquiry that are in no way reasonable and make it impractical for potential buyers to rely on the recitals in a deed of trust. I will address each of these concerns separately.

*Procedural Irregularities*

¶37 Initially, I disagree with the majority that [***27] a violation of statutory timelines by a [**1287] trustee is a procedural irregularity that invalidates a foreclosure sale. The majority's reasoning all but eliminates

Page 9

the statutory requirement that a challenge to a foreclosure sale be brought before the sale takes place. Until today, we have consistently held that the statutory procedure of seeking to enjoin the sale is "'the only means by which a grantor may preclude a sale once foreclosure has begun with receipt of the notice of sale and foreclosure.'" *Plein v. Lackey, 149 Wn.2d 214, 226, 67 P.3d 1061 (2003) (quoting Cox v. Helenius, 103 Wn.2d 383, 388, 693 P.2d 683 (1985)).* Under the act, interest holders are notified that "[a]nyone having any objection to the sale *on any grounds whatsoever* will be afforded an opportunity to be heard as to those objections if they bring a lawsuit to restrain the sale ... ." *RCW 61.24.040(1)(f)(IX)* (emphasis added). Accordingly, courts deem the claims of interested parties waived where they failed to seek an injunction despite having had an opportunity to do so. *Plein, 149 Wn.2d at 227.* Courts thereby maintain the sanctity of land titles and ensure efficient resolution of defaulted loans secured by real  [***28] property.

¶38 The majority erodes these protections for reasons that cannot withstand scrutiny. First, the majority assumes that property owners such as the Teccas are not in a position to restrain a sale when they have acknowledged their default by entering into a forbearance agreement.  [*579] Majority at 571 ("Dinkinson seemingly argues that [the owners'] presale remedies were triggered the moment they received notice of the trustee's sale. Yet this argument assumes the borrower can challenge the underlying debt."). But an owner can seek to enjoin the sale even while acknowledging the underlying debt. *See Steward v. Good, 51 Wn. App. 509, 514-15, 754 P.2d 150 (1988)* (noting owners in default having right to contest a procedurally defective sale where they failed to enjoin the sale). The second reason the majority declines to find waiver is that the owners had no opportunity to restrain the sale. *See* majority at 571. This contention is belied by the uncontested facts. The Teccas were given notice that their property was subject to a foreclosure sale unless they moved to enjoin. Given that the trustee did not file a notice of discontinuance or reinstate the deed of trust, *see RCW 61.24.090(3), (6),*  [***29] it should have been clear to the owners that a motion to restrain the sale was in order. 27 MARJORIE DICK ROMBAUER, WASHINGTON PRACTICE: CREDITORS' REMEDIES--DEBTORS' RELIEF § 3.61, at 202-03 (1998) (noting "the dangers" in failing to enjoin the sale "are obvious").

¶39 The majority makes much of the forbearance agreement, suggesting that the sale itself violated its terms and that the owners were therefore taken by surprise when the sale occurred in breach of contract. *See* majority at 571-72. A breach of contract, however, is not unforeseeable. The statutory means for grantors to protect themselves against the contingency of a *scheduled,*

*recorded* judicial foreclosure sale going forward is by enjoining it. *RCW 61.24.040(1)(f)(IX).* Assuming the property was sold in violation of the forbearance agreement, the owners' remedy is to be found in a suit for breach of contract seeking money damages. They should not be allowed to invalidate the sale  [*580] when they had ample opportunity to obtain an injunction and raise these grounds in a presale lawsuit. [11]

> 11  Amendments to the act postdating this case additionally authorize a claim for monetary damages against a trustee for, among other things, failure to  [***30] materially comply with the act. *RCW 61.24.127;* ENGROSSED S.B. 5810, at 8-9, 61st Leg., Reg. Sess. (Wash. 2009). While the Teccas argue these legislative changes support granting relief, significantly none of the relief they authorize includes invalidating a foreclosure sale. Nor do the amendments alter the strong statutory policy of requiring a motion to enjoin a sale before it occurs. Indeed, the amendments to *RCW 61.24.127* suggest that money damages against the trustee are warranted in part because the grantor cannot recover property sold to a bona fide purchaser. *See RCW 61.24.127(2)(c)* (noting claims for money damages do "not affect in any way the validity or finality of the foreclosure sale or a subsequent transfer of the property").

¶40 The majority claims this case is unlike *Plein*--where the borrower had a defense  [**1288] two months before the sale--because here the owners supposedly had no knowledge of their alleged breach of the forbearance agreement in time to restrain the sale. Again, this assertion is not borne out by the record. To the extent that the owners' "defense" is that the sale occurred outside the 120 day limit, they were on notice that the timelines had passed and had sufficient  [***31] time to move to enjoin any sale. [12] To the extent the owners claim they had no written notice of the sale continuance in accordance with the forbearance requirement, they *did* receive the statutory notice their property was to be sold and could have sought an injunction to enforce the contract and restrain the sale.

> 12  The sale occurred 161 days after originally scheduled. Because the trustee must be given at least five days' notice, *RCW 61.24.130(2),* the owners had 36 days following the expiration of the 120 day period during which they could have sought to restrain an untimely sale. At the time of the events in this case, the act permitted a continuance to be announced by public proclamation at the time and place fixed for sale. Former *RCW 61.24.040(6)* (2006). The act was subsequently

amended to require written notice for continuances beyond the date of sale. SUBSTITUTE S.B. 5378, at 13, 60th Leg., Reg. Sess. (Wash. 2008).

¶41 This court in *Plein* held that waiver applies when the borrower has notice of the right to enjoin the sale, knows the asserted defense before the sale, and fails to pursue presale remedies. *Plein, 149 Wn.2d at 229* (citing *RCW 61.24.040(1)(f)(IX)*). In contrast, the majority [***32] today holds that "courts must be able to review postsale challenges" [*581] promptly brought "to ensure trustees strictly comply with the requirements of the act." Majority at 572. In fact, the majority concludes that seeking an injunction is merely permissive. *Id.* at 570 (noting use of the word "'may'").

¶42 This line of reasoning effectively ends the doctrine of waiver and overrules *Plein.* The majority concludes that "[w]hen trustees strictly comply with their legal obligations under the act, interested parties will have no claim for postsale relief ... ." *Id.* at 572. Of course, it is hard to imagine a claim for relief *not* based on a violation of some legal obligation. Therefore, the majority's approach would actually permit postsale challenges to foreclosure sales as a general rule, at least where "the claims are promptly asserted." *Id.* [13]

13 The act's procedural requirements are extensive. While strict compliance is ideal, it is far from certain that failure to comply with every statutory mandate will prejudice the interest-holder. Where the interest-holder believes noncompliance results in prejudice, an injunction should be sought. Of course, some procedural violations cannot be enjoined before [***33] the sale because they occur *at* the sale. For example, if the trustee accepted the third highest bid, instead of the first highest bid, a postsale challenge may be countenanced. However, the challenger would still need to show prejudice. *Colo. Structures, Inc. v. Blue Mountain Plaza, LLC, 159 Wn. App. 654, 666, 246 P.3d 835 (2011)* ("The same standard applies to defects occurring at or after the time of the sale--absent actual prejudice from the error, a claim is waived if no action is taken to set aside the sale."). Even then, the grantor would likely only have an action for money damages against the trustee, assuming the deed recitals were adequate under *RCW 61.24.040* and the buyer was a bona fide purchaser.

¶43 There may be some merit to creating a system that allows courts to broadly review procedural irregularities in foreclosure proceedings after a sale is complete, but this is not the system our legislature created in the act. The legislature ranked finality of land sales over entertaining the postsale grievances of grantors. This valuing of sale finality is evidenced by the *conclusive* presumption given to deed recitals showing statutory compliance when the buyer is a bona fide purchaser. [***34] *RCW 61.24.040(7).* It is also manifested by the statutory warning that failure to enjoin may result in waiver "of *any* proper grounds for invalidating [*582] the Trustee's sale." *RCW 61.24.040(1)(f)(IX)* (emphasis added). This rule makes sense. Many interest-holders, especially grantors in default, may decide a challenge is not worth their while and will allow the sale to proceed. Doing so is a gamble, the risk of which the act places squarely on the interest-holder.

¶44 The majority would undo this risk allocation. Its insistence that the goal of [**1289] stable land titles is better met "[w]hen trustees strictly comply with their legal obligations under the act," majority at 572, misses the mark. If a postsale challenge may be entertained, grantors aware of a procedural flaw will be well advised to keep mum until after the sale, especially when no cure of default is on the horizon. After all, a presale challenge may not delay the sale at all; it may simply result in a court order requiring the sale conform to the act. Waiting until the sale has occurred, however, may prove advantageous: under the majority's view, the sale is invalid and the beneficiary's only option may be to begin the notice and sale process [***35] all over again. By the time the property is finally renoticed for sale, the grantor may be able to cure and avoid the sale altogether.

¶45 Although avoiding the sale may benefit the individual grantor, allowing such postsale challenges will weaken the reliability of nonjudicial foreclosure sales to the detriment of landowners and purchasers alike. Indeed, if a trustee's sale can be challenged after the fact, "'title insurers will not insure, secured lenders will not lend on, and buyers will not purchase real property with title tracing to a trustee's deed.'" *Plein, 149 Wn.2d at 228 n.5* (quoting amicus memorandum).

*Bona Fide Purchaser Doctrine*

¶46 I also disagree with the majority's analysis of the bona fide purchaser doctrine. The breadth of circumstances the majority considers to conclude Dickinson was not a bona fide purchaser will make it very difficult for buyers at foreclosure sales to qualify for this status.

[*583] ¶47 Building on Dickinson's real estate experience, the majority finds significance in Dickinson's brief conversation with Karen Tecca, during which he offered to buy the property and she insisted the foreclosure sale would not happen. From this exchange, which lasted about one minute, the majority [***36] draws the remarkable conclusion that Dickinson was on inquiry notice that the sale may have violated the forbearance agreement. The majority's implicit reasoning goes like

Case 3:12-cv-05778-RBL   Document 5   Filed 08/29/12   Page 99 of 100

Page 11

174 Wn.2d 560, *; 276 P.3d 1277, **;
2012 Wash. LEXIS 378, ***

this: Tecca's refusal to sell would suggest to the reasonably prudent person that Tecca intended to cure her default; a reasonable person, learning the property had come up for sale, would contact Tecca again to see if she had tried to cure the default; this conversation would likely reveal the forbearance agreement and its terms; and a reasonable person would then discern the fact that the sale was not in accordance with the agreement.

¶48 Not only does this chain of reasoning pile inference upon inference, it promotes a duty of inquiry previously unknown in this area of the law. Under the majority's view, a potential buyer must approach foreclosure proceedings with an inquisitiveness verging on the paranoid. He is no longer entitled to rely on the notice of sale as establishing default if the owner has said something that implies an intent to cure. If such a verbal statement puts a potential buyer on notice that the owner may not actually be in default, what about the owner's *written* statement of intent to make payments? [***37] After all, a trust deed grantor has promised to make timely payments to the beneficiary, so is the existence of a recorded trust deed a circumstance putting a reasonable person on notice to ask the grantor whether the default referred to in the notice of sale actually exists? Apparently so, because the majority holds that Dickinson was not entitled to rely on the deed recitals here.

¶49 As to the deed recitals, the majority acknowledges that a recital of statutory compliance constitutes prima facie evidence of such compliance, which is conclusive in favor of a bona fide purchaser. Majority at 571 & n.5; *see* [*584] *RCW 61.24.040(7)*. However, the majority takes an unprecedented look at these recitals, questioning their adequacy in light of "conclusory language" stating that all legal requirements of the act are met. Majority at 573 & n.9. The majority insists the deed must set forth the "facts" supporting this statement, which apparently includes the existence of any forbearance agreement that might support an owner's claim that a default [**1290] has been cured. But we have never required such an exacting standard and have previously accepted nearly identical conclusory recitals. *See Glidden v. Mun. Auth. of Tacoma, 111 Wn.2d 341, 345, 347, 758 P.2d 487, 764 P.2d 647 (1988)* [***38] (giving conclusive presumption where deed inaccurately stated that notice had been "'transmitted by mail to all persons entitled thereto'" and that "'[a]ll legal requirements and all provisions of said Deed of Trust have been complied

with, as to acts to be performed and notices to be given, as provided in Chapter 61.24 RCW'" (quoting recitals)).

¶50 Moreover, the specific recitals in this deed follow the form set out in the real property desk book and undoubtedly repeated in countless deeds recorded in Washington. 4 WASH. STATE BAR ASS'N, WASHINGTON REAL PROPERTY DESKBOOK § 47.11(16), at 39-40 (3d ed. Supp. 2001). There is no precedent for the majority's conclusion that the drafters of deeds of trust fail to "recite the facts showing [statutory compliance]," *RCW 61.24.040(7)*, when they use standard-form statements of statutory compliance. Majority at 573 n.9 (emphasis omitted). The majority does not explain why conclusory recitals of fact are any less recitals of fact, and we have never before construed the statute in the way the majority would. Moreover, the majority is really complaining that the recitals in the deed of trust were inaccurate. *Id.* (noting that "the deed also misleadingly listed the sale date [***39] in the notice of trustee's sale as February 16, 2007, instead of the original sale date of September 8, 2006" and that it "incorrectly states that the default was not cured"). Such looking behind the face of the deed's factual recitals is [*585] precisely what the presumptive validity of the deed precludes. *RCW 61.24.040(7)*. I fear that the majority's new found scrutiny of deeds of trust will greatly unsettle reasonable expectations in land titles.

¶51 In sum, I depart from the majority's reasoning. I would reject the argument that a trustee's failure to strictly comply with the procedural requirements of the act invalidates a sale and opens the door to a postsale challenge. I would also be more circumspect in considering when a buyer at a foreclosure sale may rely on the recitals in a trust deed to claim the status of a bona fide purchaser. Instead, I would resolve this case on the narrow equitable ground that courts may invalidate an unfair foreclosure sale based on the combination of a grossly inadequate sale price and procedural irregularities. The combination of these circumstances cannot be known before the sale, and so it is appropriate--in exceptional circumstances--for a court to grant [***40] relief even after the sale has occurred. On this basis alone, I would affirm the Court of Appeals.

FAIRHURST, J., concurs with STEPHENS, J.

Annotated Revised Code of Washington by LexisNexis

1

2

3

4

5

6

7

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF PIERCE

8

SCOTT TOWNSEND & DEBORAH
9  TOWNSEND, husband and wife,
            Plaintiffs,

10

        vs.                                    CASE NO: 12-2-10932-5

11

QUALITY LOAN SERVICE CORP. OF          SUPPLEMENTAL AUTHORITY
12  WASHINGTON, et. al.                      & APPLICATION TO PLAINTIFF'S
            Defendants.                         MOTION FOR ORDER TO SHOW
13                                             CAUSE UNDER CONSIDERATION

14

15

16    I.  **KEY ISSUE RAISED BY PLAINTIFFS FOR ORDER RESTRAINING TRUSTEE**
        **FROM CONDUCTING SALE  BEING RESOLVED BY SUPPLEMENTAL**
17                          **AUTHORITY**

18         The issue raised by the Plaintiffs in their Motion is whether Quality Loan Service Corp.

19   of Washington, the purported Trustee, can proceed to sale of Plaintiffs' homestead at all because

20   it has violated *RCW 61.24.040 (6)* which states:

21             (6) The trustee may for any cause the trustee deems advantageous, ***continue the sale***
                ***for a period or periods not exceeding a total of one hundred twenty days by a public***
22              ***proclamation at the time and place fixed for sale in the notice of sale*** or,
                alternatively, by giving notice of the time and place of the postponed sale in the
23              manner and to the persons specified in *RCW 61.24.040(1)(b), (c), (d), and (e)* and
                publishing a copy of such notice once in the newspaper(s) described in *RCW*
24

3501 RUCKER AVE, EVERETT WA 98201
727-269-9334/FAX 727-264-2447
*MOTION TO RESTRAIN FORECLOSURE – 1*